HANNAH ET AL. *v.* LARCHE ET AL.

No. 549. Argued January 18–19, 1960.—Decided June 20, 1960.*

---

*Together with No. 550, *Hannah et al.* v. *Slawson et al.*, on petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit.

*Deputy Attorney General Walsh* argued the causes for appellants in No. 549 and petitioners in No. 550. On the brief were *Solicitor General Rankin, Acting Assistant Attorney General Ryan, Philip Elman, Harold H. Greene* and *David Rubin.*

*Jack P. F. Gremillion,* Attorney General of Louisiana, argued the cause for appellees in No. 549. With him on the brief were *George M. Ponder,* First Assistant Attorney General, and *Albin P. Lassiter.*

*W. M. Shaw* argued the cause and filed a brief for respondents in No. 550.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

These cases involve the validity of certain Rules of Procedure adopted by the Commission on Civil Rights, which was established by Congress in 1957.[1] Civil Rights Act of 1957, 71 Stat. 634, 42 U. S. C. §§ 1975–1975e. They arise out of the Commission's investigation of alleged Negro voting deprivations in the State of Louisiana. The appellees in No. 549 are registrars of voters in the State of Louisiana, and the respondents in No. 550 are private citizens of Louisiana.[2] After having been summoned to

---

[1] Although the Civil Rights Act of 1957 provided that the Commission should cease to exist within two years after its creation, 71 Stat. 635, 42 U. S. C. § 1975c, in 1959 Congress extended the Commission's life for an additional two years. 73 Stat. 724.

[2] The appellants in No. 549 and the petitioners in No. 550 are the individual members of the Civil Rights Commission. Hereinafter,

appear before a hearing which the Commission proposed to conduct in Shreveport, Louisiana, these registrars and private citizens requested the United States District Court for the Western District of Louisiana to enjoin the Commission from holding its anticipated hearing. It was alleged, among other things, that the Commission's Rules of Procedure governing the conduct of its investigations were unconstitutional. The specific rules challenged are those which provide that the identity of persons submitting complaints to the Commission need not be disclosed, and that those summoned to testify before the Commission, including persons against whom complaints have been filed, may not cross-examine other witnesses called by the Commission. The District Court held that the Commission was not authorized to adopt the Rules of Procedure here in question, and therefore issued an injunction which prohibits the Commission from holding any hearings in the Western District of Louisiana as long as the challenged procedures remain in force. The Commission requested this Court to review the District Court's decision.[3] We granted the Commission's motion to advance the cases, and oral argument was accordingly scheduled on the jurisdiction on appeal in No. 549, on the petition for certiorari in No. 550, and on the merits of both cases.

Having heard oral argument as scheduled, we now take jurisdiction in No. 549 and grant certiorari in No.

---

they will be referred to as "the Commission." The appellees in No. 549 and the respondents in No. 550 will both hereinafter be referred to as "respondents."

[3] Because No. 549 was heard and decided by a three-judge District Court, a direct appeal to this Court was sought by the Commission pursuant to 28 U. S. C. § 1253. The Commission also filed an appeal in No. 550 with the United States Court of Appeals for the Fifth Circuit. However, before the Court of Appeals could render a decision in No. 550, the Commission filed a petition for certiorari pursuant to Rule 20 of this Court.

550. The specific questions which we must decide are (1) whether the Commission was authorized by Congress to adopt the Rules of Procedure challenged by the respondents, and (2) if so, whether those procedures violate the Due Process Clause of the Fifth Amendment.

A description of the events leading up to this litigation is necessary not only to place the legal questions in their proper factual context, but also to indicate the significance of the Commission's proposed Shreveport hearing. During the months prior to its decision to convene the hearing, the Commission had received some sixty-seven complaints from individual Negroes who alleged that they had been discriminatorily deprived of their right to vote. Based upon these complaints, and pursuant to its statutory mandate to "investigate allegations in writing under oath or affirmation that certain citizens of the United States are being deprived of their right to vote and have that vote counted by reason of their color, race, religion, or national origin," [4] the Commission began its investigation into the Louisiana voting situation by making several *ex parte* attempts to acquire information. Thus, in March 1959, a member of the Commission's staff interviewed the Voting Registrars of Claiborne, Caddo, and Webster Parishes, but obtained little relevant information. During one of these interviews the staff member is alleged to have informed Mrs. Lannie Linton, the Registrar of Claiborne Parish, that the Commission had on file four sworn statements charging her with depriving Negroes of their voting rights solely because of their race. Subsequent to this interview, Mr. W. M. Shaw, Mrs. Linton's personal attorney, wrote a letter to Mr. Gordon M. Tiffany, the Staff Director of the Commission, in which it was asserted that Mrs. Linton knew the sworn complaints lodged against

---

[4] Section 104 of the Civil Rights Act of 1957, 71 Stat. 635, 42 U. S. C. § 1975c (a)(1).

her to be false. The letter also indicated that Mrs. Linton wished to prefer perjury charges against the affiants, and Mr. Shaw therefore demanded that the Commission forward to him copies of the affidavits so that a proper presentment could be made to the grand jury. On April 14, 1959, Mr. Tiffany replied to Mr. Shaw's letter and indicated that the Commission had denied the request for copies of the sworn affidavits. Mr. Shaw was also informed of the following official statement adopted by the Commission:

"The Commission from its first meeting forward, having considered all complaints submitted to it as confidential because such confidentiality is essential in carrying out the statutory duties of the Commission, the Staff Director is hereby instructed not to disclose the names of complainants or other information contained in complaints to anyone except members of the Commission and members of the staff assigned to process, study, or investigate such complaints."

A copy of Mr. Tiffany's letter was sent to Mr. Jack P. F. Gremillion, the Attorney General of Louisiana, who had previously informed the Commission that under Louisiana law the Attorney General is the legal adviser for all voting registrars in any hearing or investigation before a federal commission.

Another attempt to obtain information occurred on May 13, 1959, when Mr. Tiffany, upon Commission authorization, sent a list of 315 written interrogatories to Mr. Gremillion. These interrogatories requested very detailed and specific information, and were to be answered by the voting registrars of nineteen Louisiana parishes. Although Mr. Gremillion and the Governor of Louisiana had previously assented to the idea of written interrogatories, on May 28, 1959, Mr. Gremillion sent a letter to

Mr. Tiffany indicating that the voting registrars refused to answer the interrogatories. The reasons given for the refusal were that many of the questions seemed unrelated to the functions of voting registrars, that the questions were neither accompanied by specific complaints nor related to specific complaints, and that the time and research required to answer the questions placed an unreasonable burden upon the voting registrars.

In response to this refusal, on May 29, 1959, Mr. Tiffany sent a telegram to Mr. Gremillion, informing the latter that the interrogatories were based upon specific allegations received by the Commission, and reaffirming the Commission's position that the identity of specific complainants would not be disclosed. Mr. Tiffany's letter contained a further request that the interrogatories be answered and sent to the Commission by June 5, 1959. On June 2, 1959, Mr. Gremillion wrote a letter to Mr. Tiffany reiterating the registrars' refusal, and again requesting that the names of complainants be disclosed.

Finally, as a result of this exchange of correspondence, and because the Commission's attempts to obtain information *ex parte* had been frustrated, the Commission, acting pursuant to Section 105 (f) of the Civil Rights Act of 1957,[5] decided to hold the Shreveport hearing commencing on July 13, 1959.

---

[5] Section 105 (f) of the Civil Rights Act authorizes the Commission to hold hearings and to subpoena witnesses. That section provides:

"(f) *Hearings; issuance of subpenas.*

"The Commission, or on the authorization of the Commission any subcommittee of two or more members, at least one of whom shall be of each major political party, may, for the purpose of carrying out the provisions of this Act, hold such hearings and act at such times and places as the Commission or such authorized subcommittee may deem advisable. Subpenas for the attendance and testimony of witnesses or the production of written or other matter may be issued in accordance with the rules of the Commission as contained in sec-

Notice of the scheduled hearing was sent to Mr. Gremillion, and between June 29 and July 6, subpoenas *duces tecum* were served on the respondents in No. 549, ordering them to appear at the hearing and to bring with them various voting and registration records within their custody and control. Subpoenas were also served upon the respondents in No. 550. These private citizens were apparently summoned to explain their activities with regard to alleged deprivations of Negro voting rights.[6]

On July 8, 1959, Mr. Tiffany wrote to Mr. Gremillion, enclosing copies of the Civil Rights Act and of the Commission's Rules of Procedure.[7] Mr. Gremillion's attention was also drawn to Section 102 (h) of the Civil Rights Act, which permits witnesses to submit, subject to the discretion of the Commission, brief and pertinent sworn statements for inclusion in the record.[8]

Two days later, on July 10, 1959, the respondents in No. 549 and No. 550 filed two separate complaints in the Dis-

---

tion 1975a (j) and (k) of this title, over the signature of the Chairman of the Commission or of such subcommittee, and may be served by any person designated by such Chairman." 71 Stat. 636, 42 U. S. C. § 1975d (f).

[6] The role of private citizens in depriving Negroes of their right to vote was one of the questions involved in *United States* v. *McElveen*, 180 F. Supp. 10 (E. D. La.), aff'd as to defendant Thomas, 362 U. S. 58.

[7] Rule 3 (i) of the Commission's Rules of Procedure, adopted on July 1, 1958, prohibits witnesses or their counsel from cross-examining other witnesses. That Rule reads:
"Interrogation of witnesses at hearings shall be conducted only by members of the Commission or by authorized staff personnel."

[8] The full text of Section 102 (h) of the Civil Rights Act reads as follows:

"(h) *Submission of written statements.*

"In the discretion of the Commission, witnesses may submit brief and pertinent sworn statements in writing for inclusion in the record. The Commission is the sole judge of the pertinency of testimony and evidence adduced at its hearings." 71 Stat. 634, 42 U. S. C. § 1975a (h).

trict Court for the Western District of Louisiana. Both complaints alleged that the respondents would suffer irreparable harm by virtue of the Commission's refusal to furnish the names of persons who had filed allegations of voting deprivations, as well as the contents of the allegations, and by its further refusal to permit the respondents to confront and cross-examine the persons making such allegations. In addition, both complaints alleged that the Commission's refusals not only violated numerous provisions of the Federal Constitution, but also constituted "ultra vires" acts not authorized either by Congress or the Chief Executive. The respondents in No. 549 also alleged that they could not comply with the subpoenas *duces tecum* because Louisiana law prohibited voting registrars from removing their voting records except "upon an order of a competent court," and because the Commission was not such a "court." Finally, the complaint in No. 549 alleged that the Civil Rights Act was unconstitutional because it did not constitute "appropriate legislation within the meaning of Section (2) of the XV Amendment."

Both complaints sought a temporary restraining order and a permanent injunction prohibiting the members of the Commission (a) from compelling the "testimony from or the production of any records" by the respondents until copies of the sworn charges, together with the names and addresses of the persons filing such charges were given to the respondents; [9] (b) from "conducting any hearing pursuant to the rules and regulations adopted by" the Commission; and (c) from "conspiring together . . . or with any other person . . . to deny complainants their rights and privileges as citizens" of Louisiana or the

---

[9] Under the Civil Rights Act, the Commission not only has the power to issue subpoenas under Section 105 (f), but, as is customary when Congress confers the subpoena power on an investigative agency, the Commission is also authorized to enforce its subpoenas by enlisting the aid of the federal courts. 71 Stat. 636, 42 U. S. C. § 1975d (g).

United States "or to deny to complainants their right to be confronted by their accusers, to know the nature and character of the charges made against them," and to be represented by counsel. The complaint in No. 549 also sought a declaratory judgment that the Civil Rights Act of 1957 was unconstitutional.

On the day that the complaints were filed, the district judge held a combined hearing on the prayers for temporary restraining orders. On July 12, 1959, he found that the respondents would suffer irreparable harm if the hearings were held as scheduled, and he therefore issued the requested temporary restraining orders and rules to show cause why a preliminary injunction should not be granted. *Larche* v. *Hannah,* 176 F. Supp. 791. The order prohibited the Commission from holding any hearings which concerned the respondents or others similarly situated until a determination was made on the motion for a preliminary injunction.

Inasmuch as the complaint in No. 549 attacked the constitutionality of the Civil Rights Act, a three-judge court was convened pursuant to 28 U. S. C. § 2282. Since the complaint in No. 550 did not challenge the constitutionality of the Civil Rights Act of 1957, that case was scheduled to be heard by a single district judge. That district judge was also a member of the three-judge panel in No. 549, and a combined hearing was therefore held on both cases on August 7, 1959.

On October 7, 1959, a divided three-judge District Court filed an opinion in No. 549. *Larche* v. *Hannah,* 177 F. Supp. 816. The court held that the Civil Rights Act of 1957 was constitutional since it "very definitely constitutes appropriate legislation" authorized by the Fourteenth and Fifteenth Amendments and Article I, Section 2, of the Federal Constitution. *Id.,* at 821. The court then held that since the respondents' allegations with regard to apprisal, confrontation, and cross-examination

raised a "serious constitutional issue," this Court's decision in *Greene* v. *McElroy,* 360 U. S. 474, required a preliminary determination as to whether Congress specifically authorized the Commission "to adopt rules for investigations . . . which would deprive parties investigated of their rights of confrontation and cross-examination and their right to be apprised of the charges against them." 177 F. Supp., at 822. The court found that Congress had not so authorized the Commission, and an injunction was therefore issued. In deciding the case on the issue of authorization, the court never reached the "serious constitutional issue" raised by the respondents' allegations.[10] The injunction prohibits the Commission from holding any hearing in the Western District of Louisiana wherein the registrars, "accused of depriving others of the right to vote, would be denied the right of apprisal, confrontation, and cross examination." [11] The single dis-

---

[10] Judge Wisdom, who dissented, was of the opinion that the procedures adopted by the Commission were authorized by Congress, and that those procedures were also constitutional. 177 F. Supp., at 828.

[11] The court's injunction reads as follows:

"For reasons assigned in the Court's written opinion of October 6, 1959,

"It is ordered, adjudged and decreed that defendants and their agents, servants, employees and attorneys are enjoined and restrained from conducting the proposed hearing in Shreveport, Louisiana, wherein plaintiff registrars, accused of depriving others of the right to vote, would be denied the right of apprisal, confrontation and cross examination.

"This injunction does not prohibit all hearings pursuant to Public Law 85–315, 85th Congress, 42 U. S. C. A. 1975, et seq., but only those hearings proposed to be held in the Western District of Louisiana wherein the accused are denied the right of apprisal, confrontation and cross examination.

"Thus done and signed in Chambers on this the 9 day of November, 1959."

The breadth of this injunction is indicated by the fact that the Commission is not only prohibited from compelling respondents'

430

trict judge rendered a decision in No. 550 incorporating by reference the opinion of the three-judge District Court, and an injunction, identical in substance to that entered in No. 549, was issued.

## I.

We held last Term in *Greene* v. *McElroy, supra,* that when action taken by an inferior governmental agency was accomplished by procedures which raise serious constitutional questions, an initial inquiry will be made to determine whether or not "the President or Congress, within their respective constitutional powers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use." *Id.,* at 507. The considerations which prompted us in *Greene* to analyze the question of authorization before reaching the constitutional issues presented are no less pertinent in this case. Obviously, if the Civil Rights Commission was not authorized to adopt the procedures complained of by the respondents, the case could be disposed of without a premature determination of serious constitutional questions. See *Vitarelli* v. *Seaton,* 359 U. S. 535; *Kent* v. *Dulles,* 357 U. S. 116; *Watkins* v. *United States,* 354 U. S. 178; *Peters* v. *Hobby,* 349 U. S. 331.

We therefore consider first the question of authorization. As indicated above, the Commission specifically refused to disclose to the respondents the identity of persons who had submitted sworn complaints to the Commission and the specific charges contained in those complaints. Moreover, the respondents were informed by the Commission that they would not be permitted to cross-examine

appearance at the hearing, but it is also enjoined from conducting *any* hearing in the Western District of Louisiana under existing rules of procedure, whether or not the respondents are called as witnesses.

any witnesses at the hearing. The respondents contend, and the court below held, that Congress did not authorize the adoption of procedural rules which would deprive those being investigated by the Commission of the rights to apprisal, confrontation, and cross-examination. The court's holding is best summarized by the following language from its opinion:

> "[W]e find nothing in the Act which expressly authorizes or permits the Commission's refusal to inform persons, under investigation for criminal conduct, of the nature, cause and source of the accusations against them, and there is nothing in the Act authorizing the Commission to deprive these persons of the right of confrontation and cross-examination." 177 F. Supp., at 822.

After thoroughly analyzing the Rules of Procedure contained in the Civil Rights Act of 1957 and the legislative history which led to the adoption of that Act, we are of the opinion that the court below erred in its conclusion and that Congress did authorize the Commission to adopt the procedures here in question.

It could not be said that Congress ignored the procedures which the Commission was to follow in conducting its hearings. Section 102 of the Civil Rights Act of 1957 lists a number of procedural rights intended to safeguard witnesses from potential abuses. Briefly summarized, the relevant subdivisions of Section 102 provide that the Chairman shall make an opening statement as to the subject of the hearing; that a copy of the Commission's rules shall be made available to witnesses; that witnesses "may be accompanied by their own counsel for the purpose of advising them concerning their constitutional rights"; that potentially defamatory, degrading, or incriminating testimony shall be received in executive session, and

that any person defamed, degraded, or incriminated by such testimony shall have an opportunity to appear voluntarily as a witness and to request the Commission to subpoena additional witnesses; that testimony taken in executive session shall be released only upon the consent of the Commission; and that witnesses may submit brief and pertinent sworn statements in writing for inclusion in the record.[12]

---

[12] The complete text of Section 102 reads as follows:

"§ 1975a. *Rules of procedure.*

"(a) *Opening statement.*

"The Chairman or one designated by him to act as Chairman at a hearing of the Commission shall announce in an opening statement the subject of the hearing.

"(b) *Copy of rules.*

"A copy of the Commission's rules shall be made available to the witness before the Commission.

"(c) *Attendance of counsel.*

"Witnesses at the hearings may be accompanied by their own counsel for the purpose of advising them concerning their constitutional rights.

"(d) *Censure and exclusion of counsel.*

"The Chairman or Acting Chairman may punish breaches of order and decorum and unprofessional ethics on the part of counsel, by censure and exclusion from the hearings.

"(e) *Defamatory, degrading or incriminating evidence.*

"If the Commission determines that evidence or testimony at any hearing may tend to defame, degrade, or incriminate any person, it shall (1) receive such evidence or testimony in executive session; (2) afford such person an opportunity voluntarily to appear as a witness; and (3) receive and dispose of requests from such person to subpena additional witnesses.

"(f) *Requests for additional witnesses.*

"Except as provided in this section and section 1975d (f) of this title, the Chairman shall receive and the Commission shall dispose of requests to subpena additional witnesses.

The absence of any reference to apprisal, confrontation, and cross-examination, in addition to the fact that counsel's role is specifically limited to advising witnesses of their constitutional rights, creates a presumption that Congress did not intend witnesses appearing before the Commission to have the rights claimed by respondents. This initial presumption is strengthened beyond any

---

"(g) *Release of evidence taken in executive session.*

"No evidence or testimony taken in executive session may be released or used in public sessions without the consent of the Commission. Whoever. releases or uses in public without the consent of the Commission evidence or testimony taken in executive session shall be fined not more than $1,000, or imprisoned for not more than one year.

"(h) *Submission of written statements.*

"In the discretion of the Commission, witnesses may submit brief and pertinent sworn statements in writing for inclusion in the record. The Commission is the sole judge of the pertinency of testimony and evidence adduced at its hearings.

"(i) *Transcripts.*

"Upon payment of the cost thereof, a witness may obtain a transcript copy of his testimony given at a public session or, if given at an executive session, when authorized by the Commission.

"(j) *Witness fees.*

"A witness attending any session of the Commission shall receive $4 for each day's attendance and for the time necessarily occupied in going to and returning from the same, and 8 cents per mile for going from and returning to his place of residence. Witnesses who attend at points so far removed from their respective residences as to prohibit return thereto from day to day shall be entitled to an additional allowance of $12 per day for expenses of subsistence, including the time necessarily occupied in going to and returning from the place of attendance. Mileage payments shall be tendered to the witness upon service of a subpena issued on behalf of the Commission or any subcommittee thereof.

"(k) *Restriction on issuance of subpena.*

"The Commission shall not issue any subpena for the attendance and testimony of witnesses or for the production of written or other

reasonable doubt by an investigation of the legislative history of the Act.

The complete story of the 1957 Act begins with the 1956 House Civil Rights Bill, H. R. 627. That bill was reported out of the House Judiciary Committee without any reference to the procedures to be used by the Commission in conducting its hearings. H. R. Rep. No. 2187, 84th Cong., 2d Sess. During the floor debate, Representative Dies of Texas introduced extensive amendments designed to regulate the procedure of Commission hearings. 102 Cong. Rec. 13542. Those amendments would have guaranteed to witnesses appearing before the Commission all of the rights claimed by the respondents in these cases. The amendments provided, in pertinent part, that a person who might be adversely affected by the testimony of another "shall be fully advised by the

matter which would require the presence of the party subpenaed at a hearing to be held outside of the State, wherein the witness is found or resides or transacts business." 71 Stat. 634, 42 U. S. C. § 1975a.

In addition to the procedural safeguards provided by Section 102 of the Act, the Commission's Rules of Procedure grant additional protection. Thus, Rule 3 (f) of the Commission's Rules of Procedure provides:

"(f) An accurate transcript shall be made of the testimony of all witnesses in all hearings, either public or executive sessions, of the Commission or of any subcommittee thereof. Each witness shall have the right to inspect the record of his own testimony. A transcript copy of his testimony may be purchased by a witness pursuant to Rule 2 (i) above. Transcript copies of public sessions may be obtained by the public upon payment of the cost thereof."

And Rule 3 (j) provides:

"(j) If the Commission pursuant to Rule 2 (e), or any subcommittee thereof, determines that evidence or testimony at any hearing may tend to defame, degrade, or incriminate any person, it shall advise such person that such evidence has been given and it shall afford such person an opportunity to read the pertinent testimony and to appear as a voluntary witness or to file a sworn statement in his behalf."

Commission as to the matters into which the Commission proposes to inquire and the adverse material which is proposed to be presented"; that a person adversely affected by evidence or testimony given at a public hearing could "appear and testify or file a sworn statement in his own behalf"; that such a person could also "have the adverse witness recalled" within a stated time; and that he or his counsel could cross-examine adverse witnesses.[13]

---

[13] The amendments introduced by Representative Dies read, in pertinent part, as follows:

" '(q) A person shall be considered to be adversely affected by evidence or testimony of a witness if the Commission determines that: (i) the evidence or testimony would constitute libel or slander if not presented before the Commission or (ii) the evidence or testimony alleges crime or misconduct or tends to disgrace or otherwise to expose the person to public contempt, hatred, or scorn.

" '(r) Insofar as practicable, any person whose activities are the subject of investigation by the Commission, or about whom adverse information is proposed to be presented at a public hearing of the Commission, shall be fully advised by the Commission as to the matters into which the Commission proposes to inquire and the adverse material which is proposed to be presented. Insofar as practicable, all material reflecting adversely on the character or reputation of any individual which is proposed to be presented at a public hearing of the Commission shall be first reviewed in executive session to determine its reliability and probative value and shall not be presented at a public hearing except pursuant to majority vote of the Commission.

" '(s) If a person is adversely affected by evidence or testimony given in a public hearing, that person shall have the right: (i) to appear and testify or file a sworn statement in his own behalf, (ii) to have the adverse witness recalled upon application made within thirty days after introduction of such evidence or determination of the adverse witness' testimony, (iii) to be represented by counsel as heretofore provided, (iv) to cross-examine (in person or by counsel) such adverse witness, and (v) subject to the discretion of the Commission, to obtain the issuance by the Commission of subpenas for witnesses, documents, and other evidence in his defense. Such opportunity for rebuttal shall be afforded promptly and, so

436

The bill, as finally passed by the House, contained all of the amendments proposed by Representative Dies. 102 Cong. Rec. 13998–13999. However, before further action could be taken, the bill died in the Senate. Although many proposals relating to civil rights were introduced in the 1957 Session of Congress, two bills became the prominent contenders for support. One was S. 83, a bill introduced by Senator Dirksen containing the same procedural provisions that the amended House bill in 1956 had contained. The other bill, H. R. 6127, was introduced by Representative Celler, Chairman of the House Judiciary Committee, and this bill incorporated the so-called House "fair play" rules as the procedures which should govern the conduct of Commission hearings.[14] After extensive debate and hearings, H. R. 6127

far as practicable, such hearing shall be conducted at the same place and under the same circumstances as the hearing at which adverse testimony was presented.

" 'Cross-examination shall be limited to one hour for each witness, unless the Commission by majority vote extends the time for each witness or group of witnesses.

" '(t) If a person is adversely affected by evidence or testimony given in executive session or by material in the Commission files or records, and if public release of such evidence, testimony, or material is contemplated such person shall have, prior to the public release of such evidence or testimony or material or any disclosure of or comment upon it by members of the Commission or Commission staff or taking of similar evidence or testimony in a public hearing, the rights heretofore conferred and the right to inspect at least as much of the evidence or testimony of the adverse witness or material as will be made public or the subject of a public hearing.

" '(u) Any witness (except a member of the press who testifies in his professional capacity) who gives testimony before the Commission in an open hearing which reflects adversely on the character or reputation of another person may be required by the Commission to disclose his sources of information, unless to do so would endanger the national security.' " 102 Cong. Rec. 13542–13543.

[14] The complete text of the House "fair play" rules may be found in H. Res. 151, 84th Cong., 1st Sess.

was finally passed by both Houses of Congress, and the House "fair play" rules, which make no provision for advance notice, confrontation, or cross-examination, were adopted in preference to the more protective rules suggested in S. 83.[15]

[15] That Congress focused upon the issues here involved and recognized the distinctions between H. R. 6127 and S. 83 is attested to by the following extracts from the floor debate and committee hearings:

In testifying before both the House and Senate Subcommittees considering the various proposed civil rights bills, Attorney General Brownell supported the adoption of the House "fair play" rules instead of the more restrictive procedures outlined in S. 83. Thus, at the Senate hearings, the Attorney General made the following statement:

"Now there is one other addition to S. 83 that I would like to make special reference to and that is the provision for rules of procedure contained in section 102 on pages 2 to 10 of S. 83.

"These rules of procedure are considerably more restrictive than those imposed on regular committees of the House and Senate. There is much in them which clearly would be desirable. We have not as yet had any experience with the use of rules such as those proposed here and we cannot predict the extent to which they might be used to obstruct the work of the Commission.

. . . . .

"Yet I feel that the task to be given to this Commission is of such great public importance that it would be a mistake to make it the vehicle for experimenting with new rules which may have to be tested out under the courts and this is only a 2-year Commission and you might have to spend those 2 years studying the rules instead of getting at the facts." Hearings before Subcommittee on Constitutional Rights of the Senate Judiciary Committee, 85th Cong., 1st Sess. 14–15.

See also Hearings before Subcommittee No. 5 of the House Judiciary Committee, 85th Cong., 1st Sess. 593.

The lack of any right to cross-examine witnesses was commented upon by members of both the House and the Senate:

Statement of Senator Talmadge during the Senate floor debate, 103 Cong. Rec. 11504:

"No provision is made for notification of persons against whom charges are to be made.

The legislative background of the Civil Rights Act not only provides evidence of congressional authorization, but it also distinguishes these cases from *Greene* v. *McElroy, supra,* upon which the court below relied so heavily. In *Greene* there was no express authorization by Congress or the President for the Department of Defense to adopt the type of security clearance program there involved. Nor was there any legislative history or executive directive indicating that the Secretary of Defense was authorized to establish a security clearance program which could deprive a person of his government employment on the basis of secret and undisclosed information. Therefore, we concluded in *Greene* that because of the serious constitutional problems presented, mere acquiescence by the President or the Congress would not be sufficient to constitute authoriza-

---

"No provision is made for persons adversely affected by testimony taken by the Commission to be present when they are accused or later to confront and cross-examine their accusers."

Statement of Senator Stennis during Senate floor debate, 103 Cong. Rec. 13835:

"Defamatory testimony tending to defame, degrade, or incriminate any person cannot be heard by the person slandered, since the testimony must be taken in executive session. There is no requirement in the proposed statute that the person injured by defamatory testimony shall have an opportunity to examine the nature of the adverse testimony. He has no right of confrontation nor cross-examination, and his request to subpena witnesses on his behalf falls within the arbitrary discretion of the Commission. There is no right to subpena witnesses."

Statement of Representative Kilday during House floor debate, 103 Cong. Rec. 8673:

"The bill provides that witnesses may be accompanied by counsel, for what purpose? 'For the purpose of advising them concerning their constitutional rights.' That is all. Even though the Commission or its own counsel develops only a portion of a transaction, and that adverse to the witness, his lawyer cannot ask a single question to develop the remainder of the transaction or the portion favorable to him."

tion for the security clearance procedures adopted by the Secretary of Defense. The facts of this case present a sharp contrast to those before the Court in *Greene.* Here, we have substantially more than the mere acquiescence upon which the Government relied in *Greene.* There was a conscious, intentional selection by Congress of one bill, providing for none of the procedures demanded by respondents, over another bill, which provided for all of those procedures. We have no doubt that Congress' consideration and rejection of the procedures here at issue constituted an authorization to the Commission to conduct its hearings according to the Rules of Procedure it has adopted, and to deny to witnesses the rights of apprisal, confrontation, and cross-examination.

---

Statement of Representative Frazier during Hearings before the House Rules Committee, 85th Cong., 1st Sess. 176:

"The authors of this proposal contemplate that it will yield thousands of complaints and even more thousands of subpenas will be issued. The various allegations will, in the first instance, be incontrovertible and wholly ex parte and the principal concerned, against whom the charges are made, when summoned as a witness is given no opportunity to cross-examine. True, the person summoned as a witness may have counsel (sec. 102), but only for the purpose of advising him of his constitutional rights."

That the bill contained the House "fair play" rules is demonstrated by the following statement of Representative Celler, the author of the bill:

"*The rules of procedure of the Commission are the same as those which govern the committees of the House.* For example, the chairman is required to make an opening statement as to the subject of the hearing. Witnesses are furnished with a copy of the Commission's rules and may be accompanied by counsel. The chairman is authorized to punish breaches of order by censure and exclusion. Protection is furnished to witnesses when it appears that a person may be the subject of derogatory information by requiring such evidence to be received in executive session, and affording the person affected the right to appear and testify, and further to submit a request for subpena of additional witnesses." 103 Cong. Rec. 8491. (Emphasis supplied.)

440

## II.

The existence of authorization inevitably requires us to determine whether the Commission's Rules of Procedure are consistent with the Due Process Clause of the Fifth Amendment.[16]

Since the requirements of due process frequently vary with the type of proceeding involved, *e. g.*, compare *Opp Cotton Mills, Inc.* v. *Administrator,* 312 U. S. 126, 152, with *Interstate Commerce Comm'n* v. *Louisville & N. R. Co.,* 227 U. S. 88, 91, we think it is necessary at the outset to ascertain both the nature and function of this Commission. Section 104 of the Civil Rights Act of 1957 specifies the duties to be performed by the Commission. Those duties consist of (1) investigating written, sworn allegations that anyone has been discriminatorily deprived of his right to vote; (2) studying and collecting information "concerning legal developments constituting a denial of equal protection of the laws under the Constitution"; and (3) reporting to the President and Congress on its activities, findings, and recommendations.[17] As is appar-

---

[16] Although the respondents contend that the procedures adopted by the Commission also violate their rights under the Sixth Amendment, their claim does not merit extensive discussion. That Amendment is specifically limited to "criminal prosecutions," and the proceedings of the Commission clearly do not fall within that category. See *United States* v. *Zucker,* 161 U. S. 475, 481.

[17] The full text of Section 104 of the Act reads as follows:

"§ 1975c. *Duties; reports; termination.*

"(a) The Commission shall—

"(1) investigate allegations in writing under oath or affirmation that certain citizens of the United States are being deprived of their right to vote and have that vote counted by reason of their color, race, religion, or national origin; which writing, under oath or affirmation, shall set forth the facts upon which such belief or beliefs are based;

"(2) study and collect information concerning legal developments

ent from this brief sketch of the statutory duties imposed upon the Commission, its function is purely investigative and fact-finding. It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's legal rights. The only purpose of its existence is to find facts which may subsequently be used as the basis for legislative or executive action.

The specific constitutional question, therefore, is whether persons whose conduct is under investigation by a governmental agency of this nature are entitled, by virtue of the Due Process Clause, to know the specific charges that are being investigated, as well as the identity of the complainants,[18] and to have the right to cross-

---

constituting a denial of equal protection of the laws under the Constitution; and

"(3) appraise the laws and policies of the Federal Government with respect to equal protection of the laws under the Constitution.

"(b) The Commission shall submit interim reports to the President and to the Congress at such times as either the Commission or the President shall deem desirable, and shall submit to the President and to the Congress a final and comprehensive report of its activities, findings, and recommendations not later than two years from September 9, 1957.

"(c) Sixty days after the submission of its final report and recommendations the Commission shall cease to exist." 71 Stat. 635, 42 U. S. C. § 1975c.

[18] It should be noted that the respondents in these cases did have notice of the general nature of the inquiry. The only information withheld from them was the identity of specific complainants and the exact charges made by those complainants. Because most of the charges related to the denial of individual voting rights, it is apparent that the Commission could not have disclosed the exact charges without also revealing the names of the complainants.

examine those complainants and other witnesses. Although these procedures are very desirable in some situations, for the reasons which we shall now indicate, we are of the opinion that they are not constitutionally required in the proceedings of this Commission.

"Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used. Therefore, as a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account. An analysis of these factors demonstrates why it is that the particular rights claimed by the respondents need not be conferred upon those appearing before purely investigative agencies, of which the Commission on Civil Rights is one.

It is probably sufficient merely to indicate that the rights claimed by respondents are normally associated only with adjudicatory proceedings, and that since the Commission does not adjudicate, it need not be bound by adjudicatory procedures. Yet, the respondents contend, and the court below implied, that such procedures

are required since the Commission's proceedings might' irreparably harm those being investigated by subjecting them to public opprobrium and scorn, the distinct likelihood of losing their jobs, and the possibility of criminal prosecutions. That any of these consequences will result is purely conjectural. There is nothing in the record to indicate that such will be the case or that past Commission hearings have had any harmful effects upon witnesses appearing before the Commission. However, even if such collateral consequences were to flow from the Commission's investigations, they would not be the result of any affirmative determinations made by the Commission, and they would not affect the legitimacy of the Commission's investigative function.[19]

On the other hand, the investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings, and if persons who might be indirectly affected by an investigation were given an absolute right to cross-examine every witness called to testify. Fact-finding agencies without any power to adjudicate would be diverted from their legitimate duties and would be plagued by the injection of collateral issues that would make the investigation interminable. Even a person not called as a witness could demand the right to appear at the hearing, cross-examine any witness whose testimony or sworn affidavit allegedly defamed or incriminated him, and call an unlimited number of witnesses of

---

[19] Cf. *Sinclair* v. *United States,* 279 U. S. 263, 295, holding that Congress' legitimate right to investigate is not affected by the fact that information disclosed at the investigation may also be used in a subsequent criminal prosecution. Cf. also *McGrain* v. *Daugherty,* 273 U. S. 135, 179–180, holding that 'a regular congressional investigation is not rendered invalid merely because "it might possibly disclose crime or wrongdoing" on the part of witnesses summoned to appear at the investigation. *Id.,* at 180.

his own selection.[20] This type of proceeding would make a shambles of the investigation and stifle the agency in its gathering of facts.

In addition to these persuasive considerations, we think it is highly significant that the Commission's procedures are not historically foreign to other forms of investigation under our system. Far from being unique, the Rules of Procedure adopted by the Commission are similar to those which, as shown by the Appendix to this opinion,[21] have traditionally governed the proceedings of the vast majority of governmental investigating agencies.

A frequently used type of investigative agency is the legislative committee. The investigative function of such committees is as old as the Republic.[22] The volumes written about legislative investigations have proliferated almost as rapidly as the legislative committees themselves, and the courts have on more than one occasion been confronted with the legal problems presented by such committees.[23] The procedures adopted by legislative inves-

---

[20] The injunction issued by the court below would certainly lead to this result since it prohibits the Commission from conducting *any* hearing under existing procedure, even though those being investigated are not summoned to testify.

[21] A compilation of the rules of procedure governing the investigative proceedings of a representative group of administrative and executive agencies, presidential commissions, and congressional committees is set out in the Appendix to this opinion, *post,* p. 454.

[22] The first full-fledged congressional investigating committee was established in 1792 to "inquire into the causes of the failure of the late expedition under Major General St. Clair." 3 Annals of Cong. 493 (1792). The development and use of legislative investigation by the colonial governments is discussed in Eberling, Congressional Investigations, 13–30. The English origin of legislative investigation in this country is discussed in Dimock, Congressional Investigating Committees, 46–56.

[23] See, *e. g., Kilbourn* v. *Thompson,* 103 U. S. 168; *McGrain* v. *Daugherty,* 273 U. S. 135; *Sinclair* v. *United States,* 279 U. S. 263; *Christoffel* v. *United States,* 338 U. S. 84; *United States* v. *Bryan,*

tigating committees have varied over the course of years. Yet, the history of these committees clearly demonstrates that only infrequently have witnesses appearing before congressional committees been afforded the procedural rights normally associated with an adjudicative proceeding. In the vast majority of instances, congressional committees have not given witnesses detailed notice or an opportunity to confront, cross-examine and call other witnesses.[24]

The history of investigations conducted by the executive branch of the Government is also marked by a decided absence of those procedures here in issue.[25] The best example is provided by the administrative regulatory agencies. Although these agencies normally make determinations of a quasi-judicial nature, they also frequently conduct purely fact-finding investigations. When doing the former, they are governed by the Administrative Procedure Act, 60 Stat. 237, 5 U. S. C. §§ 1001–1011, and the parties to the adjudication are accorded the traditional safeguards of a trial. However, when

---

339 U. S. 323; *United States* v. *Fleischman*, 339 U. S. 349; *Watkins* v. *United States*, 354 U. S. 178; *Barenblatt* v. *United States*, 360 U. S. 109.

[24] See Appendix, *post*, pp. 478–485. See also Dimock, Congressional Investigating Committees, 153; Eberling, Congressional Investigations, 283, 390; McGeary, The Developments of Congressional Investigative Power, 80; Liacos, Rights of Witnesses Before Congressional Committees, 33 B. U. L. Rev. 337, 359–361; American Bar Association, Special Committee on Individual Rights as Affected by National Security, Appendix to Report on Congressional Investigations, 67–68.

The English practice is described in Clokie and Robinson, Royal Commissions of Inquiry; Finer, Congressional Investigations: The British System, 18 U. of Chi. L. Rev. 521; Keeton, Parliamentary Tribunals of Inquiry, in Vol. 12, Current Legal Problems 1959, 12.

[25] See Appendix, *post*, pp. 454–471. See also Gellhorn, Federal Administrative Proceedings, 108; Report of the Attorney General's Committee on Administrative Procedure and the various Monographs written by that Committee.

these agencies are conducting nonadjudicative, fact-finding investigations, rights such as apprisal, confrontation, and cross-examination generally do not obtain.

A typical agency is the Federal Trade Commission. Its rules draw a clear distinction between adjudicative proceedings and investigative proceedings. 16 CFR, 1958 Supp., § 1.34. Although the latter are frequently initiated by complaints from undisclosed informants, *id.*, §§ 1.11, 1.15, and although the Commission may use the information obtained during investigations to initiate adjudicative proceedings, *id.*, § 1.42, nevertheless, persons summoned to appear before investigative proceedings are entitled only to a general notice of "the purpose and scope of the investigation," *id.*, § 1.33, and while they may have the advice of counsel, "counsel may not, as a matter of right, otherwise participate in the investigation." *Id.*, § 1.40. The reason for these rules is obvious. The Federal Trade Commission could not conduct an efficient investigation if persons being investigated were permitted to convert the investigation into a trial. We have found no authorities suggesting that the rules governing Federal Trade Commission investigations violate the Constitution, and this is understandable since any person investigated by the Federal Trade Commission will be accorded all the traditional judicial safeguards at a subsequent adjudicative proceeding, just as any person investigated by the Civil Rights Commission will have all of these safeguards, should some type of adjudicative proceeding subsequently be instituted.

Another regulatory agency which distinguishes between adjudicative and investigative proceedings is the Securities and Exchange Commission. This Commission conducts numerous investigations, many of which are initiated by complaints from private parties. 17 CFR § 202.4. Although the Commission's Rules provide that parties to adjudicative proceedings shall be given detailed

notice of the matters to be determined, *id.*, 1959 Supp., § 201.3, and a right to cross-examine witnesses appearing at the hearing, *id.*, § 201.5, those provisions of the Rules are made specifically inapplicable to investigations, *id.*, § 201.20,[26] even though the Commission is required to

---

[26] The Commission's practice with regard to investigations was described by the Attorney General's Committee on Administrative Procedure, Monograph, Securities Exchange Commission, 34–41. The following extract is pertinent here:

*"Where formal investigations are utilized as preliminaries to decisive proceedings, the person being investigated is normally not sent a notice, which, in any event, is not public.* The order for investigation, which includes the notice, is, however, exhibited to any person examined in the course of such investigation who so requests; since ordinarily the investigation will include the examination of the person suspected of violation, he will, thus, have actual notice of the investigation. Since a person may, on the other hand, be wholly unaware of the fact that he is being investigated until his friends who are interviewed so inform him, and since this may sometimes give rise to antagonism and a feeling that the Commission is besmirching him behind his back, no reason is apparent why, simply as a matter of good will, the Commission should not in ordinary cases send a copy of its order for investigation to the person under investigation.

. . . . .

"The Commission's Rules of Practice expressly provide that all such rules (governing notice, amendments, objections to evidence, briefs, and the like) are inapplicable to formal investigatory hearings in the absence of express provision to the contrary in the order and with the exception of rule II, which relates to appearance and practice by representatives before the Commission. The testimony given in such investigations is recorded . . . . *In the usual case, witnesses are granted the right to be accompanied by counsel, but the latter's role is limited simply to advising the witnesses in respect of their right against self-incrimination without claiming the benefits of the immunity clause of the pertinent statute* (a right of which the presiding officer is, in any event, instructed to apprise the witnesses) *and to making objections to questions which assertedly exceed the scope of the order of investigation." Id.*, 37–38. (Emphasis supplied.) See also Loss, Securities Regulation (1951), 1152.

448

initiate civil or criminal proceedings if an investigation discloses violations of law.[27] Undoubtedly, the reason for this distinction is to prevent the sterilization of investigations by burdening them with trial-like procedures.

Another type of executive agency which frequently conducts investigations is the presidential commission. Although a survey of these commissions presents no definite pattern of practice, each commission has generally been permitted to adopt whatever rules of procedure seem appropriate to it,[28] and it is clear that many of the most famous presidential commissions have adopted rules similar to those governing the proceedings of the Civil Rights Commission.[29] For example, the Roberts Commission established in 1941 to ascertain the facts relating to the Japanese attack upon Pearl Harbor, and to determine whether the success of the attack resulted from any derelictions of duty on the part of American military personnel, did not permit any of the parties involved in the investigation to cross-examine other witnesses. In fact, many of the persons whose conduct was being investigated were not represented by counsel and were not present during the interrogation of other witnesses. Hearings before the Joint Committee on the Investigation of the Pearl Harbor Attack, 79th Cong., 1st Sess., pts. 22–25.

Having considered the procedures traditionally followed by executive and legislative investigating agencies, we think it would be profitable at this point to discuss the oldest and, perhaps, the best known of all investigative bodies, the grand jury. It has never been considered necessary to grant a witness summoned before the grand

---

[27] Loss, Securities Regulation (1951), 1153. See also the statutes cited in the Appendix, *post*, p. 463.

[28] Marcy, Presidential Commissions, 97–101.

[29] See Appendix, *post*, pp. 472–479.

jury the right to refuse to testify merely because he did not have access to the identity and testimony of prior witnesses. Nor has it ever been considered essential that a person being investigated by the grand jury be permitted to come before that body and cross-examine witnesses who may have accused him of wrongdoing. Undoubtedly, the procedural rights claimed by the respondents have not been extended to grand jury hearings because of the disruptive influence their injection would have on the proceedings, and also because the grand jury merely investigates and reports. It does not try.

We think it is fairly clear from this survey of various phases of governmental investigation that witnesses appearing before investigating agencies, whether legislative, executive, or judicial, have generally not been accorded the rights of apprisal, confrontation, or cross-examination. Although we do not suggest that the grand jury and the congressional investigating committee are identical in all respects to the Civil Rights Commission,[30] we mention them, in addition to the executive agencies and commissions created by Congress, to show that the rules of this Commission are not alien to those which have historically governed the procedure of investigations conducted by agencies in the three major branches of our Government. The logic behind this historical practice was recognized and described by Mr. Justice Cardozo's landmark opinion in *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294. In that

[30] However, the courts have on more than one occasion likened investigative agencies of the executive branch of Government to a grand jury. See, *e. g., United States* v. *Morton Salt Co.,* 338 U. S. 632, 642; *Oklahoma Press Pub. Co.* v. *Walling,* 327 U. S. 186, 216; *Consolidated Mines of Calif.* v. *Securities & Exchange Comm'n,* 97 F. 2d 704, 708 (C. A. 9th Cir.); *Woolley* v. *United States,* 97 F. 2d 258, 262 (C. A. 9th Cir.).

case, the Court was concerned with the type of hearing that the Tariff Commission was required to hold when conducting its investigations. Specifically, the Court was asked to decide whether the Tariff Act of 1922, 42 Stat. 858, gave witnesses appearing before the Commission the right to examine confidential information in the Commission files and to cross-examine other witnesses testifying at Commission hearings. Although the Court did not phrase its holding in terms of due process, we think that the following language from Mr. Justice Cardozo's opinion is significant:

> "The Tariff Commission advises; these others ordain. There is indeed this common bond that all alike are instruments in a governmental process which according to the accepted classification is legislative, not judicial. . . . Whatever the appropriate label, the kind of order that emerges from a hearing before a body with power to ordain is one that impinges upon legal rights in a very different way from the report of a commission which merely investigates and advises. The traditionary forms of hearing appropriate to the one body are unknown to the other. What issues from the Tariff Commission as a report and recommendation to the President, may be accepted, modified, or rejected. If it happens to be accepted, it does not bear fruit in anything that trenches upon legal rights." 288 U. S., at 318.

And in referring to the traditional practice of investigating bodies, Mr. Justice Cardozo had this to say:

> "[W]ithin the meaning of this act the 'hearing' assured to one affected by a change of duty does not include a privilege to ransack the records of the Commission, and to subject its confidential agents to an examination as to all that they have learned. *There*

*was no thought to revolutionize the practice of investigating bodies generally and of this one in particular."* *Id.*, at 319. (Emphasis supplied.)

Thus, the purely investigative nature of the Commission's proceedings, the burden that the claimed rights would place upon those proceedings, and the traditional procedure of investigating agencies in general, leads us to conclude that the Commission's Rules of Procedure comport with the requirements of due process.[31]

Nor do the authorities cited by respondents support their position. They rely primarily upon *Morgan* v. *United States*, 304 U. S. 1; *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U. S. 123; and *Greene* v. *McElroy, supra.* Those cases are all distinguishable in that the government agency involved in each was found by the Court to have made determinations in the nature of adjudications affecting legal rights. Thus, in *Morgan,* the action of the Secretary of Agriculture in fixing the maximum rates to be charged by market agencies at stockyards was challenged. In voiding the order of the Secretary for his failure to conduct a trial-like hearing, the Court referred to the adjudicatory nature of the proceeding:

"Congress, in requiring a 'full hearing,' had regard to judicial standards,—not in any technical sense but with respect to those fundamental requirements of fairness which are of the essence of due process in a proceeding of a judicial nature." 304 U. S., at 19.

---

[31] The Commission cites *In re Groban,* 352 U. S. 330, and *Anonymous* v. *Baker,* 360 U. S. 287, in support of its position. Each of us who participated in those cases adheres to the view to which he subscribed therein. However, because there are significant differences between the *Groban* and *Anonymous* cases and the instant litigation, and because the result we reach today is supported by the other considerations analyzed herein, the Court does not find it necessary to discuss either of those cases.

Likewise, in *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U. S. 123, 140–141, this Court held that the Attorney General's action constituted an adjudication. Finally, our decision last year in *Greene v. McElroy* lends little support to the respondents' position. The governmental action there reviewed was certainly of a judicial nature. The various Security Clearance Boards involved in *Greene* were not conducting an investigation; they were determining whether Greene could have a security clearance—a license in a real sense, and one that had a significant impact upon his employment. By contrast, the Civil Rights Commission does not make any binding orders or issue "clearances" or licenses having legal effect. Rather, it investigates and reports leaving affirmative action, if there is to be any, to other governmental agencies where there must be action *de novo.*

The respondents have also contended that the Civil Rights Act of 1957 is inappropriate legislation under the Fifteenth Amendment. We have considered this argument, and we find it to be without merit. It would unduly lengthen this opinion to add anything to the District Court's disposition of this claim. See 177 F. Supp., at 819–821.

Respondents' final argument is that the Commission's hearings should be governed by Section 7 of the Administrative Procedure Act, 60 Stat. 241, 5 U. S. C. § 1006, which specifies the hearing procedures to be used by agencies falling within the coverage of the Act. One of those procedures is the right of every party to conduct "such cross-examination as may be required for a full and true disclosure of the facts." However, what the respondents fail to recognize is that Section 7, by its terms, applies only to proceedings under Section 4, 60 Stat. 238, 5 U. S. C. § 1003 (rule making), and Section 5, 60 Stat.

239, 5-U. S. C. § 1004 (adjudications), of the Act. As we have already indicated, the Civil Rights Commission performs none of the functions specified in those sections.

From what we have said, it is obvious that the District Court erred in both cases in enjoining the Commission from holding its Shreveport hearing. The court's judgments are accordingly reversed, and the cases are remanded with direction to vacate the injunctions.

*Reversed and remanded.*

[For opinion of Mr. JUSTICE FRANKFURTER, concurring in the result, see *post*, p. 486.]

[For concurring opinion of Mr. JUSTICE HARLAN, joined by Mr. JUSTICE CLARK, see *post*, p. 493.]

[For dissenting opinion of Mr. JUSTICE DOUGLAS, joined by Mr. JUSTICE BLACK, see *post*, p. 493.]

454

## APPENDIX TO OPINION

[Footnotes at end of table]

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
| --- | --- | --- |
| *Executive and Administrative Agencies* [2] Atomic Energy Commission. | The Commission is authorized to "make such studies and investigations, . . . and hold such meetings or hearings as . . . [it] may deem necessary or proper to assist it in exercising" any of its statutory functions. 68 Stat. 948, 42 U.S.C. § 2201 (c). | The Commission may subpoena any person to appear and testify or produce documents "at any designated place." 68 Stat. 948, 42 U. S. C. § 2201 (c). |

## OF THE COURT [1]

[Footnotes at end of table]

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| This is not specified by statute. The Commission's Rules of Practice provide that "[t]he procedure to be followed in informal hearings shall be such as will best serve the purpose of the hearing." 10 CFR § 2.720. The Rules of Practice do not require any specific type of notice to be given in informal hearings. *Ibid.* | This is not specified by statute. The Commission's Rules of Practice do not require that those summoned to appear before informal hearings be given the right to cross-examine other witnesses. Rather, the Commission is given the discretion to adopt those procedures which "will best serve the purpose of the hearing." 10 CFR § 2.720. | The Commission's Rules of Practice draw a sharp distinction between informal and formal hearings. Formal hearings are used only in "cases of adjudication," 10 CFR § 2.708, and parties to the hearings are given detailed notice of the subject of the hearing, *id.*, § 2.735, as well as the right to cross-examine witnesses, *id.*, § 2.747. Informal hearings are used in investigations "for the purposes of obtaining necessary or useful information, and affording participation by interested persons, in the formulation, amendment, or rescission of rules and regulations." *Id.*, § 2.708. The safeguards which are accorded in the formal, adjudicative hearings are not mentioned in the Commission's Rule relating to informal hearings. *Id.*, § 2.720. |

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
|--------|-------------------------------------------|----------------------------------------------------------------|
| Federal Communications Commission. | (1) The Commission is authorized to investigate any matters contained in a complaint "in such manner and by such means as it shall deem proper." 48 Stat. 1073, 47 U. S. C. § 208. (2) The Federal Communications Commission was also authorized to conduct a special investigation of the American Telephone and Telegraph Company, and to obtain information concerning the company's history and structure, the services rendered by it, its failure to reduce rates, the effect of monopolistic control on the company, the methods of competition engaged in by the company, and the company's attempts to influence public opinion by the use of propaganda. 49 Stat. 43. | (1) The Commission may "subpena the attendance and testimony of witnesses and the production of all books, papers, schedules of charges, contracts, agreements, and documents relating to any matter under investigation." 48 Stat. 1096, 47 U. S. C. § 409 (e). (2) The Commission was also given the subpoena power by the statute authorizing the investigation of the American Telephone and Telegraph Company. 49 Stat. 45. |
| Federal Trade Commission. | (1) The Commission is authorized to investigate "the organization, business, conduct, practices, and management of any corporation engaged in commerce"; to make an investigation of the manner in which antitrust decrees are being carried out; to investigate and report the facts relating to any alleged violations of the anti- | (1) The Commission may "subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation." 38 |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| This is not specified by statute. The Commission's Rules of Practice do not specify the type of notice to be given in investigative proceedings. However, the Rules do provide that the "[p]rocedures to be followed by the Commission shall, unless specifically prescribed . . . [in the Rules], be such as in the opinion of the Commission will best serve the purposes of . . . [any investigative] proceeding." 47 CFR § 1.10. | This is not specified by statute. Nor do the Commission's Rules of Practice refer to cross-examination in investigative proceedings. Therefore, whether persons appearing at an investigation . have the privilege of cross-examining witnesses apparently depends upon whether the Commission is of the opinion that cross-examination "will best serve the purposes of such proceeding." 47 CFR § 1.10. It should also be noted that even in that portion of the Commission's Rules relating to adjudicative proceedings, there is no specific provision relating to cross-examination. *Id.*, §§ 1.101–1.193. | It should be noted that the Commission's Report on the Telephone Investigation made no mention of the type of notice, if any, given to those summoned to appear at the investigation. Nor was there any reference to cross-examination. The Commission did permit the Company "to submit statements in writing pointing out any inaccuracies in factual data or statistics in the reports introduced in the hearings or in any testimony in connection therewith, provided that such statements were confined to the presentation of facts and that no attempt would be made therein to draw conclusions therefrom." H. R. Doc. No. 340, 76th Cong., 1st Sess. xviii. |
| (1) This is not specified by statute. The Commission's Rules of Practice provide that "[a]ny party under investigation compelled to furnish information or documentary evidence shall be advised with respect to | (1) This is not specified by statute. The Commission's Rules of Practice provide that a person required to testify in an investigative proceeding "may be accompanied and advised by counsel, but | (1) It is interesting to note that the Commission's Rules of Practice draw an express and sharp distinction between investigative and adjudicative proceedings, and that the Commission's Rules relating to notice and |

458

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
|---|---|---|
| Federal Trade Commission— Continued. | trust Acts by any corporation; and "to investigate . . . trade conditions in and with foreign countries where associations, combinations, or practices of manufacturers, merchants, or traders, or other conditions, may affect the foreign trade of the United States." 38 Stat. 721–722, 15 U.S.C. § 46. (2) The Commission was also authorized to conduct a special investigation of the motor vehicle industry to determine (a) "the extent of concentration of control and of monopoly in the manufacturing, warehousing, distribution, and sale of automobiles, accessories, and parts, including methods and devices used by manufacturers for obtaining and maintaining their control or monopoly . . . and the extent, if any, to which fraudulent, dishonest, unfair, and injurious methods . . . [were] employed, including combinations, monopolies, price fixing, or unfair trade practices"; and (b) "the extent to which any of the antitrust laws of the United States . . . [were] being violated." 52 Stat. 218. | Stat. 722, 15 U.S.C. § 49. (2) The Commission was also given the subpoena power under the statute authorizing the investigation of the motor vehicle industry. 52 Stat. 218. |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
| --- | --- | --- |
| the purpose and scope of the investigation." 16 CFR, 1959 Supp., § 1.33. (2) The Commission's Report on the Motor Vehicle Industry did not indicate what type of notice, if any, was given to those summoned to testify at the investigation. H.R. Doc. No. 468, 76th Cong., 1st Sess. Presumably, the Commission's regular Rules of Practice obtained. | counsel may not, as a matter of right, otherwise participate in the investigation." 16 CFR, 1959 Supp., § 1.40. Moreover, while the Rules of Practice make no mention of the right to cross-examine witnesses in investigative proceedings, see *id.*, § 1.31–1.42, such a right is specifically given to parties in an adjudicative proceeding. *Id.*, § 3.16. (2) The Commission's Report on the Motor Vehicle Industry did not refer to cross-examination. H.R. Doc. No. 468, 76th Cong., 1st Sess. Presumably, the Commission's regular Rules of Practice obtained. | cross-examination in investigative proceedings are very similar to those adopted by the Civil Rights Commission. (2) It should also be observed that FTC investigations may be initiated "upon complaint by members of the consuming public, businessmen, or the concerns aggrieved by unfair practices," 16 CFR, 1959 Supp., § 1.11, and that complaints received by the Commission may charge "any violation of law over which the Commission has jurisdiction." *Id.*, § 1.12. (3) Also relevant to our inquiry is the fact that the Commission does not "publish or divulge the name of an applicant or complaining party." *Id.*, § 1.15. (4) Finally, it is important to observe that the FTC, unlike the Civil Rights Commission, has the authority to commence adjudicative proceedings based upon the material obtained by means of investigative proceedings. *Id.*, § 1.42. |

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
| --- | --- | --- |
| National Labor Relations Board. | Under the National Labor Relations Act, the Board is given the power to investigate petitions and charges submitted to it relating to union representation and unfair labor practices. 61 Stat. 144, 149, 29 U.S.C. §§ 159 (c), 160 (l). | "For the purpose of all hearings and investigations . . . the Board [may] . . . copy any evidence of any person being investigated or proceeded against that relates to any matter under investigation," and it may also issue subpoenas requiring the attendance and testimony of witnesses in any proceeding or investigation. 61 Stat. 150, 29 U. S. C. § 161. |
| Securities and Exchange Commission. | (1) Under the Securities Act of 1933, as amended, the Commission is authorized to conduct "all investigations which . . . are necessary and proper for the enforcement of" the Act. 48 Stat. 85, 15 U. S. C. § 77s (b). (2) The Securities Exchange Act of 1934 authorizes the Commission to "make such investigations as it deems necessary to determine whether any person has violated or is about to violate any provisions of . . . [the Act] or any rule or regulation thereunder." 48 Stat. 899, 15 U. S. C. § 78u (a). (3) The Public Utility Holding Company Act of 1935 empowers the Commission to "investigate any facts, condi- | All of the Acts which authorize the Commission to conduct investigations also bestow upon it the power to subpoena witnesses, compel their attendance, and require the production of any books, correspondence, memoranda, contracts, agreements, and other records which are relevant to the investigation. Securities Act of 1933, 48 Stat. 85, 15 U. S. C. § 77s (b); Securi- |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| This is not specified by statute. The Board's Statements of Procedure and Rules and Regulations provide for the preliminary investigation of all petitions and charges received by the Board. Although a copy of the initial charge may be served upon an alleged violator, there is no specific rule requiring the Board to give notice of the preliminary investigation. See 29 CFR, 1960 Supp., §§101.4, 101.18, 101.22, 101.27, 101.32, 102.63, 102.77, 102.85. | This is not specified by statute. The Board's Statements of Procedure and Rules and Regulations provide for the right to cross-examine witnesses at formal, adjudicative hearings, 29 CFR, 1960 Supp., §§101.10, 102.38, 102.66, 102.86, 102.90, but there is no such provision with regard to preliminary investigations. *Id.*, §§101.4, 101.18, 101.22, 101.27, 101.32, 102.63, 102.77, 102.85. | It should be noted that the National Labor Relations Board may use the information collected during preliminary investigations to initiate adjudicative proceedings. 61 Stat. 149, 29 U. S. C. § 160 (l). The Commission on Civil Rights has no such power. Moreover, the Board, unlike the Civil Rights Commission, may use the information obtained by it through investigations to petition the federal courts for appropriate injunctive relief, 61 Stat. 149, 29 U. S. C. § 160 (l). |
| This is not specified by statute. Nor do the Commission's Rules of Practice relating to formal investigations make any mention of the type of notice which must be given in such proceedings. 17 CFR § 202.4. The Commission's Rules do provide for the giving of notice in adjudicative proceedings, *id.*, 1959 Supp., § 201.3, but this provision is made specifically inapplicable to investigative proceedings. *Id.*, § 201.20. | This is not specified by statute. The Commission's Rules of Practice make no mention of the right to cross-examine witnesses in investigative proceedings. 17 CFR § 202.4. Parties are given the right to cross-examine witnesses in adjudicative proceedings, *id.*, § 201.5, but this provision is made specifically inapplicable to investigative proceedings. *Id.*, § 201.20. | The Securities and Exchange Commission's procedures for investigative proceedings are very similar to those of the Civil Rights Commission. Investigations may be initiated upon complaints received from members of the public, and these complaints may contain specific charges of illegal conduct. 17 CFR § 202.4. It should be noted, however, that the Securities and Exchange Commission, unlike the Civil |

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
|---|---|---|
| Securities and Exchange Commission—Con. | tions, practices, or matters which it may deem necessary or appropriate to determine whether any person has violated or is about to violate any provision of . . . [the Act] or any rule or regulation thereunder, or to aid in the enforcement of the provisions of . . . [the Act], in the prescribing of rules and regulations thereunder, or in obtaining information to serve as a basis for recommending further legislation concerning the matters to which . . . [the Act] relates." 49 Stat. 831, 15 U. S. C. § 79r (a).<br>(4) The Trust Indenture Act of 1939 authorizes the Commission to conduct "any investigation . . . which . . . is necessary and proper for the enforcement of" the Act. 53 Stat. 1174, 15 U. S. C. § 77uuu (a).<br>(5) The Investment Company Act of 1940 gives the Commission the power to "make such investigations as it deems necessary to determine whether any person has violated or is about to violate any provision of . . . [the Act] or of any rule, regulation, or order thereunder, or to determine whether any action in any court or any proceeding before the Commission shall be instituted under . . . [the Act] against a particular person or persons, or with respect to a particular person or persons, or with respect to a particular transaction or transactions." 54 Stat. 842, 15 U. S. C. § 80a–41 (a).<br>(6) Finally, under the Investment Advisers Act of 1940, the Commission is authorized to determine by investigation | ties Exchange Act of 1934, 48 Stat. 900, 15 U. S. C. § 78u (b); Public Utility Holding Company Act of 1935, 49 Stat. 831, 15 U. S. C. § 79r (c); Trust Indenture Act of 1939, 53 Stat. 1174, 15 U. S. C. § 77uuu (a); Investment Company Act of 1940, 54 Stat. 842, 15 U. S. C. § 80a–41 (b); Investment Advisers Act of 1940, 54 Stat. 853, 15 U. S. C. § 80b–9 (b). |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| | | Rights Commission, is an adjudicatory body, and it may use the information gathered through investigative proceedings to initiate "administrative proceedings looking to the imposition of remedial sanctions, . . . (or) injunction proceedings in the courts, and, in the case of a willful violation," it may refer the "matter to the Department of Justice for criminal prosecution." *Ibid.* See also Securities Act of 1933, 48 Stat. 86, 15 U. S. C. § 77t (b); Securities Exchange Act of 1934, 48 Stat. 900, 15 U. S. C. § 78u (e); Public Utility Holding Company Act of 1935, 49 Stat. 832, 15 U. S. C. § 79r (f); Investment Company Act of 1940, 54 Stat. 843, 15 U. S. C. § 80a–41 (e); Investment Advisers Act of 1940, 54 Stat. 854, 15 U. S. C. § 80b–9 (e). |

464

| Agency | Scope of agency's investigative authority | *Extent of agency's subpoena power in investigative proceedings* |
|---|---|---|
| Securities and Exchange Commission—Con. | whether "the provisions of . . . [the Act] or of any rule or regulation prescribed under the authority thereof, have been or are about to be violated by any person." 54 Stat. 853, 15 U. S. C. § 80b–9 (a). | |
| Office of Price Stabilization.[5] | The Defense Production Act of 1950 authorized the President "to issue regulations and orders establishing a ceiling or ceilings on the price, rental, commission, margin, rate, fee, charge, or allowance paid or received on the sale or delivery, or the purchase or receipt, by or to any person, of any material or service, and at the same time . . . issue regulations and orders stabilizing wages, salaries, and other compensation in accordance with provisions of" the Act. 64 Stat. 803. This authority was delegated to the Economic Stabilization Administrator by Exec. Order No. 10161, 15 Fed. Reg. 6105. The Administrator in turn delegated the duty of issuing price regulations to the Office of Price Stabilization. Gen. Order No. 2 of the Economic Stabilization Agency, 16 Fed. Reg. 738. Pursuant to this authority, the Office of Price Stabilization promulgated Rules of Procedure, Section 2 of which provided that investigations would be held before the issuance of a ceiling price regulation. Price Procedural Regulation 1, Revision 2—General Price Procedures, § 2, 17 Fed. Reg. 3788. | The Defense Production Act of 1950 conferred upon the President the power, "by subpena or otherwise, to obtain such information from, require such reports and the keeping of such records by, make such inspection of the books, records, and other writings, premises or property of, and take the sworn testimony of, any person as may be necessary or appropriate, in his discretion, to the enforcement or the administration of . . . [the] Act and the regulations or orders issued thereunder." 64 Stat. 816. This power was delegated to the Office of Price Stabilization by Exec. Order No. 10161, 15 Fed. Reg. 6105; Gen. Order No. 2 of the Economic Stabilization Agency, 16 Fed. Reg. 738. |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| | | |
| This was not specified by statute or Executive Order. The Office's Rules of Procedure provided that a general public notice was to be given in the Federal Register of all pre-issuance hearings. Price Procedural Regulation 1—General Price Procedures, § 4, 17 Fed. Reg. 3788. | This was not specified by statute or Executive Order. Nor did the Office's Rules of Procedure make any mention of the right to cross-examine witnesses appearing at pre-issuance hearings. The Rules merely said that the hearing was to "be conducted in such manner, consistent with the need for expeditious action, as will permit the fullest possible presentation of the evidence by such persons as are, in the judgment of the Director, best qualified to provide information with respect to matters considered at the hearing or most likely to be seriously affected by action which may be taken as a result of the hearing." Price Procedural Regulation 1—General Price Procedures, § 5, 17 Fed. Reg. 3788. | It should be noticed that the Office's pre-issuance hearings usually led to determinations which had severe effects upon certain individuals; yet, there was no provision for personalized, detailed notice or cross-examination. |

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
|---|---|---|
| Office of Price Administration.[6] | The Administrator was "authorized to make such studies and investigations and to obtain such information as he . . . [deemed] necessary or proper to assist him in prescribing any regulation or order under . . . [the] Act, or in the administration and enforcement of . . . [the] Act and regulations, orders, and price schedules thereunder." 56 Stat. 30. | "For the purpose of obtaining any information [in an investigation] . . . the Administrator . . . [could] by subpena require any . . . person to appear and testify or to appear and produce documents, or both, at any designated place." 56 Stat. 30. |
| The Department of Agriculture. | (1) Under the Perishable Agricultural Commodities Act of 1930, the Department is authorized to investigate any complaint filed with the Secretary alleging that someone has violated the Act. 46 Stat. 534, 7 U. S. C. § 499f(c). (2) The Department also enforces the Packers and Stock- | (1) The Perishable Agricultural Commodities Act of 1930 authorizes the Secretary to "require by subpoena the attendance and testimony of witnesses and the produc- |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| This was not specified by statute. The Administrator's Rules of Procedure did not specify the type of notice, if any, to be given during the investigative stage of price regulation proceedings. 32 CFR, 1944 Supp., § 1300.2. After the investigation, the Administrator could hold a price hearing prior to issuance of the regulation, and general notice of the hearing was to be published in the Federal Register. *Id.*, § 1300.4. | This was not specified by statute. The Administrator's Rules of Procedure made no mention of the right to cross-examine witnesses during either investigations or pre-issuance hearings. 32 CFR, 1944 Supp., §§ 1300.2, 1300.5. The Rules merely provided that hearings were to be conducted "in such manner, consistent with the need for expeditious action, as will permit the fullest possible presentation of evidence by such persons as are, in the judgment of the Administrator, best qualified to provide information with respect to matters considered at the hearing or most likely to be seriously affected by action which may be taken as a result of the hearing." *Id.*, § 1300.5. | It should be noted that even though the Administrator's proceedings smacked of an adjudication, there was no express requirement that either detailed notice or the right to cross-examine witnesses be given to parties affected by the Administrator's actions. |
| This is not specified by statute. The Department's Rules of Practice adopted pursuant to the Perishable Agricultural Commodities Act and the Packers and Stockyards Act do not refer to the type | This is not specified by statute. The Department's Rules of Practice adopted pursuant to the Perishable Agricultural Commodities Act and the Packers and Stockyards Act contain no reference to | (1) The Department of Agriculture, unlike the Civil Rights Commission, may use the information obtained through investigations in its subsequent adjudicative proceedings under the Perishable Agricultural |

| Agency | Scope of agency's investigative authority | Extent of agency's sub-poena power in investigative proceedings |
|--------|-------------------------------------------|----------------------------------------------------------------|
| The Department of Agriculture—Con. | yards Act of 1921, which, for the purposes of that Act, gives the Secretary the investigative and other enforcement powers possessed by the Federal Trade Commission, 42 Stat 168, 7 U. S. C. § 222. The Department's Rules of Practice also provide that investigations shall be conducted when informal complaints charging a violation of the Act are received by the Secretary. 9 CFR § 202.23. | tion of such accounts, records, and memoranda as may be material for the determination of any complaint under" the Act. 46 Stat. 536, 7 U. S. C. § 499m (b). (2) The Packers and Stockyards Act of 1921 gives to the Secretary those powers conferred upon the Federal Trade Commission by "sections 46 and 48–50 of Title 15." Among those powers is the authority to subpoena witnesses. 42 Stat. 168, 7 U. S. C. § 222. |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| of notice, if any, which must be given in investigative proceedings, 7 CFR § 47.3; 9 CFR § 202.3, although a specific right to notice is given in adjudicative proceedings. 7 CFR §§ 47.6, 47.27; 9 CFR §§ 202.6, 202.23, 202.39. | cross-examination during investigative proceedings, 7 CFR § 47.3; 9 CFR § 202.3, although such a right is given in the formal, adjudicative stage of the proceedings. 7 CFR §§ 47.15, 47.32; 9 CFR §§ 202.11, 202.29, 202.48. | Commodities Act. 7 CFR § 47.7. (2) It is also of interest that investigative proceedings under both the Perishable Agricultural Commodities Act and the Packers and Stockyards Act are commenced by the filing of complaints from private individuals. 7 CFR § 47.3; 9 CFR § 202.3. (3) Finally, it should be noted that the Department of Agriculture administers the Federal Seed Act, 53 Stat. 1275, 7 U. S. C. §§ 1551–1610, which makes it unlawful to engage in certain practices relating to the labeling and importation of seeds, and a statute regulating export standards for apples and pears, 48 Stat. 123, 7 U. S. C. §§ 581–589. The Rules of Practice adopted by the Secretary pursuant to statutory authorization provide that proceedings under these statutes shall be initiated by an investigation of the charges contained in any complaint received by the Secretary. These Rules make no mention of the type of notice, if any, given to those being investigated; |

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
|---|---|---|
| The Department of Agriculture—Con. | | |
| Commodity Exchange Commission (Department of Agriculture). | The Commodity Exchange Act empowers the Secretary of Agriculture (acting through the Commission) to "make such investigations as he may deem necessary to ascertain the facts regarding the operations of boards of trade, whether prior or subsequent to the enactment of" the Act. The Secretary is also empowered to "investigate marketing conditions of commodity and commodity products and byproducts, including supply and demand for these commodities, cost to the consumer, and handling and transportation charges." 42 Stat. 1003, as amended, 49 Stat. 1491, 7 U.S.C. § 12. | The Secretary of Agriculture (acting through the Commission) is given the same subpoena powers as are vested in the Interstate Commerce Commission by the Interstate Commerce Act, 24 Stat. 383, 27 Stat. 443, 32 Stat. 904, 34 Stat. 798, 49 U.S.C. §§ 12, 46–48. 42 Stat. 1002, as amended, 49 Stat. 1499, 69 Stat. 160, 7 U.S.C. § 15. |
| Food and Drug Administration (Department of Health, Education and Welfare). | The Regulations adopted pursuant to the Federal Caustic Poison Act, 44 Stat. 1406, 15 U.S.C. §§ 401–411, authorize the Administration to conduct investigations, 21 CFR § 285.15, and to hold preliminary hearings "whenever it appears . . . that the provisions of section 3 or 6 of the Caustic Poison Act . . . have been violated and criminal proceedings are contemplated." *Id.*, § 285.17. | The Act makes no provision for compelling testimony. |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| | | nor is there any reference to cross-examination during the investigative stage of the proceedings. 7 CFR §§ 201.151, 33.17. |
| This is not specified by statute. The Commission has no special rules for investigations; however, its Rules of Practice provide that a private party may initiate a disciplinary proceeding by filing a complaint, and that an investigation of the complaint will be made. No mention is made of the type of notice, if any, which must be given in investigative proceedings. 17 CFR § 0.53. | This is not specified by statute. The Commission has no special rules for investigations; however, its Rules of Practice provide that a private party may initiate a disciplinary proceeding by filing a complaint, and that an investigation of the complaint will be made. No mention is made of the right to cross-examine witnesses during investigative proceedings. 17 CFR § 0.53. | It is of interest to note that investigations may be initiated by complaints from private parties, and that the information obtained during investigations may be used in a subsequent adjudicative proceeding. 17 CFR § 0.53. |
| This is not specified by statute. The Administration's Regulations make no reference to notice of investigative proceedings, but they do require that general notice be given to those against whom prosecution is contemplated. 21 CFR § 285.17. | This is not specified by statute. The Administration's regulations make no mention of the right to cross-examine witnesses appearing at investigative proceedings or preliminary hearings. 21 CFR § 285.17. | It should be noted that the Administration investigates specific instances of possible unlawful activity, and that, unlike the Civil Rights Commission, the Secretary (acting through the Administration) is required to refer possible violations to the proper United States Attorney. 44 Stat. 1409, 15 U. S. C. § 409 (b). |

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
|---|---|---|
| *Presidential Commissions* United States Tariff Commission. | (1) The Commission is authorized "to investigate the administration and fiscal and industrial effects of the customs laws of this country now in force or which may be hereafter enacted, the relations between the rates of duty on raw materials and finished products, the effects of ad valorem and specific duties and of compound specific and ad valorem duties, all questions relative to the arrangement of schedules and classification of articles in the several schedules of the customs law, and, in general, . . . the operation of customs laws, including their relation to the Federal revenues, [and] their effect upon the industries and labor of the country." 46 Stat. 698, 19 U. S. C. § 1332 (a). (2) The Commission is also authorized "to investigate the tariff relations between the United States and foreign countries, commercial treaties, preferential provisions, economic alliances, the effect of export bounties and preferential transportation rates, the volume of importations compared with domestic production and consumption, and conditions, causes and effects relating to competition of foreign industries with those of the United States, including dumping and cost of production." 46 Stat. 698, 19 U. S. C. § 1332 (b). (3) The Commission may investigate "the Paris Economy Pact and similar organizations and arrangements in Europe." 46 Stat. 698, 19 U. S. C. § 1332 (c). (4) The Commission is empowered to "investigate the difference in the costs of pro- | The Commission may, "for the purposes of carrying out its functions and duties in connection with any investigation authorized by law, . . . (1) . . . have access to and the right to copy any document, paper, or record, pertinent to the subject matter under investigation, in the possession of any person, firm, copartnership, corporation, or association engaged in the production, importation, or distribution of any article under investigation, (2) . . . summon witnesses, take testimony, and administer oaths, (3) . . . require any firm, person, copartnership, corporation, or association to produce books or papers relating to any matter pertaining to such investigation, and (4) . . . require any person, firm, copartnership, corporation, or association, to furnish in writing, in such detail and in such form as the commission may prescribe, information in their possession pertain- |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| Many of the statutory provisions authorizing the Commission to hold hearings pursuant to its investigatory power require that reasonable notice of prospective hearings be given. 46 Stat. 701, 19 U. S. C. § 1336 (a); 65 Stat. 72, 19 U. S. C. § 1360 (b)(1); 65 Stat. 74, 19 U. S. C. § 1364 (a); 49 Stat. 774, 7 U. S. C. § 624 (a). The Commission's Rules of Practice also provide that public notice of any pending investigation shall be given. 19 CFR, 1960 Supp., § 201.10. | This is not specified by statute. The Commission's Rules permit a party who has entered an appearance to question a witness "for the purpose of assisting the Commission in obtaining the material facts with respect to the subject matter of the investigation." 19 CFR § 201.14. However, all questioning is done under the direction of and subject to the limitations imposed by the Commission, and a person who has not entered a formal appearance may not, as a matter of right, question witnesses. *Ibid.* See also *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294. | (1) Since the Commission's investigative powers are generally exercised to aid the President in the execution of his duties under the Tariff Act, it is readily apparent that the Commission's investigations may have far reaching effects upon those persons affected by specific tariff regulations. (2) It should also be noted that business data given to the Commission may be classified as confidential, 19 CFR § 201.6, and that confidential material contained in applications for investigation and complaints will not be made available for public inspection. *Id.*, § 201.8. |

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
|---|---|---|
| United States Tariff Commission—Con. | duction of any domestic article and of any like or similar foreign article." 46 Stat. 701, 19 U. S. C. § 1336 (a).<br>(5) The Commission is authorized to investigate any complaint alleging that a person has engaged in unfair methods of competition or unfair acts in the importation of articles into the United States. 46 Stat. 703, 19 U. S. C. § 1337 (a), (b).<br>(6) Before the President enters into negotiations concerning any proposed foreign trade agreement, the Commission is required to conduct an investigation and make a report to the President, indicating the type of agreement which will best carry out the purpose of the Tariff Act. 65 Stat. 72, 19 U. S. C. § 1360 (a).<br>(7) The Commission is authorized to "make an investigation and make a report thereon . . . to determine whether any product upon which a concession has been granted under a trade agreement is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported into the United States in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products." 65 Stat. 74, 19 U. S. C. § 1364(a).<br>(8) The Commission is authorized to investigate the effects of dumping, and to determine whether because of such dumping, "an industry in the United States is being or is likely to be injured, or is prevented from being established." 42 Stat. 11, 19 U. S. C. § 160(a). | ing to such investigation." 46 Stat. 699, as amended, 72 Stat. 679, 19 U. S. C. § 1333 (a). |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
| --- | --- | --- |
| | | |

476

| Agency | Scope of agency's investigative authority | Extent of agency's sub-poena power in investigative proceedings |
|--------|--------------------------------------------|-----------------------------------------------------------------|
| United States Tariff Commission—Con. | (9) Finally, the Commission is authorized to conduct investigations for the purpose of determining whether "any article or articles are being or are practically certain to be imported into the United States under such conditions and in such quantities as to render or tend to render ineffective, or materially interfere with, any program or operation undertaken under" the Agricultural Adjustment Act or the Soil Conservation and Domestic Allotment Act. 49 Stat. 773, as amended, 62 Stat. 1248, 7 U. S. C. § 624 (a). | |
| Commission To Investigate the Japanese Attack on Hawaii. | The Commission was authorized to investigate the attack upon Pearl Harbor in order "to provide bases for sound decisions whether any derelictions of duty or errors of judgment on the part of the United States Army or Navy personnel contributed to such successes as were achieved by the enemy on the occasion mentioned, and if so, what these derelictions or errors were, and who were responsible therefor." Exec. Order No. 8983, 6 Fed. Reg. 6569. | The Commission was authorized "to issue subpenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation by the Commission." 55 Stat. 854. |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| Neither the Executive Order creating the Commission, Exec. Order No. 8983, 6 Fed. Reg. 6569, nor the joint resolution conferring the subpoena power upon the Commission, 55 Stat. 853, required the Commission to inform prospective witnesses of complaints lodged against them. | Neither the Executive Order creating the Commission, Exec. Order No. 8983, 6 Fed. Reg. 6569, nor the joint resolution conferring the subpoena power upon the Commission, 55 Stat. 853, made any mention of the right to cross-examine. An examination of the Commission's proceedings does not disclose instances wherein any witness or party to the investigation was given the right to cross-examine other witnesses. In fact, such interested parties as Admiral Kimmel and General Short, the Navy and Army commanders at Pearl Harbor, were not even present at the hearings when other | It is of special interest that the Commission was charged with the responsibility of determining whether the successful attack upon Pearl Harbor resulted from any individual derelictions of duty. Yet, even though the Commission's investigation had all the earmarks of an adjudication, none of the procedural safeguards demanded by the respondents in these cases were provided. |

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
|---|---|---|
| Commission To Investigate the Japanese Attack on Hawaii—Continued. | | |
| Temporary National Economic Committee. | The Committee was authorized to investigate "monopoly and the concentration of economic power in and financial control over production and distribution of goods and services . . . with a view to determining . . . (1) the causes of such concentration and control and their effect upon competition; (2) the effect of the existing price system and the price policies of industry upon the general level of trade, upon employment, upon long-term profits, and upon consumption, and (3) the effect of existing tax, patent, and other Government policies upon competition, price levels, unemployment, profits, and consumption." 52 Stat. 705. | The Committee was given the same subpoena powers as were conferred upon the Securities and Exchange Commission by the Public Utility Holding Company Act, 49 Stat. 831, 15 U. S. C. § 79r(c). 52 Stat. 706. |
| *Congressional Investigating Committees* [7] Senate Committee of Privileges (1800). | The Committee was authorized to conduct an investigation into charges that William Duane, a newspaper editor, had published articles defaming the Senate. 10 Annals of Cong. 117 (1800). | The Committee was authorized "to send for persons, papers, and records, and compel the attendance of witnesses which may become requisite for the execution of their commission." 10 Annals of Cong. 121 (1800). |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| | witnesses were testifying. Hearings of the Joint Congressional Committee on the Investigation of the Pearl Harbor Attack, 79th Cong., 1st Sess., pts. 22–25. | |
| This was not specified by statute. The Rules of Procedure adopted by the Committee for the conduct of its hearings made no mention of the type of notice, if any, which was to be given to prospective witnesses. Hearings of the Temporary National Economic Committee, pt. 1, 193. | This was not specified by statute. The Rules of Procedure adopted by the Committee for the conduct of its hearings did not refer to cross-examination. There was merely a general statement that "[i]n all examination of witnesses, the rules of evidence shall be observed but liberally construed." Hearings of the Temporary National Economic Committee, pt. 1, 193. | |
| This was not specified by the authorizing resolution. However, a subsequent resolution provided that Duane was to be informed of the charges against him when he presented himself at the bar of the Senate. 10 Annals of Cong. 117 (1800). | This was not specified by the authorizing resolution. The Senate later rejected a motion to permit Duane "to have assistance of counsel for his defense," but allowed him to be heard through counsel "in denial of any facts charged against [him] or in excuse and extenuation of his offence." 10 Annals of Cong. 118, 119 (1800). | It should be noted that this Committee was investigating the allegedly unlawful conduct of a specific individual; yet, it does not appear that he was given the right to cross-examine adverse witnesses. |

480

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
|---|---|---|
| Committee of the Senate to Investigate Whether Senator John Smith of Ohio Should Retain His Seat in the Senate (1807). | Senator Smith had been accused of conspiring with Aaron Burr to commit treason, and the Committee was established to investigate the charges and to inquire whether Senator Smith "should be permitted any longer to have a seat" in the Senate. 17 Annals of Cong. 40 (1807). | The authorizing resolution did not indicate whether the Committee had the subpoena power. 17 Annals of Cong. 40 (1807). |
| Joint Committee on the Conduct of the Civil War (1861). | (1) The Committee was established "to inquire into the conduct of the present [Civil] war." Cong. Globe, 37th Cong., 2d Sess. 32, 40 (1861).<br>(2) The Committee was also authorized "to inquire into the truth of the rumored slaughter of the Union troops, after their surrender, at the recent attack of the rebel forces upon Fort Pillow, Tennessee; as, [sic] also, whether Fort Pillow could have been sufficiently reenforced or evacuated, and, if so, why it was not done." 13 Stat. 405. | The Committee had "the power to send for persons and papers." Cong. Globe, 37th Cong., 2d Sess. 32, 40 (1861). |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| This was not specified by the authorizing resolution. The Committee furnished Senator Smith with a description of the charges and evidence against him. Report of the Committee, 17 Annals of Cong. 56 (1807). | This was not specified by the authorizing resolution. Before the Committee, Senator Smith "claimed, as a right, to be heard in his defense by counsel, to have compulsory process for witnesses, and to be confronted with his accusers, as if the Committee had been a circuit court of the United States." Report of the Committee, 17 Annals of Cong. 56 (1807). However, the Committee rejected these claims on the ground that it was not a court, but rather a body whose function it was to investigate and report the facts relating to Senator Smith's conduct. *Ibid.* | Here again, it should be observed that the Committee was investigating the conduct of a particular individual, and that the Committee's findings could have had severe consequences on that individual. |
| This was not specified by the authorizing resolution. Many of the generals whose conduct was being investigated were given no notice of the charges that had been leveled against them. Botterud, The Joint Committee on the Conduct of the Civil War (M.A. Thesis, Georgetown University, 1949), 42. | This was not specified by the authorizing resolution. Many of the generals whose conduct was being investigated were not given the right to be assisted by counsel or to cross-examine other witnesses. Botterud, The Joint Committee on the Conduct of the Civil War (M.A. Thesis, Georgetown University, 1949), 42. | It should be noted that the Committee's investigation frequently centered on the allegedly derelict conduct of specific individuals. Botterud, The Joint Committee on the Conduct of the Civil War (M.A. Thesis, Georgetown University, 1949), 42. |

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
|---|---|---|
| House Committee to Investigate the Electric Boat Company of New Jersey (1908). | The Committee was established to investigate charges that the Electric Boat Company of New Jersey had "been engaged in efforts to exert corrupting influence on certain Members of Congress in their legislative capacities, and . . . [had], in fact, exerted such corrupting influence." H. R. Res. 288, 60th Cong., 1st Sess., 42 Cong. Rec. 2972. | The Committee had authority "to send for persons and papers." H. R. Res. 288, 60th Cong., 1st Sess., 42 Cong. Rec. 2972. |
| House Committee to Investigate Violations of the Antitrust Laws by the American Sugar Refining Co. (1911). | (1) The Committee was authorized to conduct an investigation "for the purpose of ascertaining whether or not there have been violations of the antitrust act of July 2, 1890, and the various acts supplementary thereto, by the American Sugar Refining Co.," and further, to "investigate the organization and operations of said American Sugar Refining Co., and its relations with other persons or corporations engaged in the business of manufacturing or refining sugar, and all other persons or corporations engaged in manufacturing or refining sugar and their relations with each other." H. R. Res., 157, 62d Cong., 1st Sess., 47 Cong. Rec. 1143. | The Committee was authorized "to compel the attendance of witnesses, [and] to send for persons and papers." H. R. Res. 157, 62d Cong., 1st Sess., 47 Cong. Rec. 1143. |
| Senate Committee to Investigate Lobbying (1935–1936). | The Committee was authorized "to make a full and complete investigation of all lobbying activities and all efforts to influence, encourage, promote, or retard legislation, directly or indirectly, in connection with the so-called 'holding-company bill', | The Committee was authorized "to require by subpena or otherwise the attendance of such witnesses and the production of such |

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| This was not specified by the authorizing resolution. However, most of the charges which led to the investigation were made in public hearings before the Rules Committee of the House. H.R. Rep. No. 1168, 60th Cong., 1st Sess. | The questioning of all witnesses was conducted by the Committee, although the parties being investigated were permitted to submit written interrogatories for the Committee to propound to certain witnesses. H. R. Rep. No. 1727, 60th Cong., 1st Sess. 11. | It is of interest that the Committee was investigating specific charges of corruption leveled against named individuals. |
| This was not specified by the authorizing resolution. Nor was this specified by the Committee's Rules of Procedure. | This was not specified by the authorizing statute. The Committee's Rules of Procedure provided that "counsel may attend witnesses summoned before this committee, but may not participate in the proceedings, either by way of examination or argument, except upon permission given by the committee, from time to time, as the occasion arises." Hearings before the Special Committee on the Investigation of the American Sugar Refining Co., 62d Cong., 1st Sess., Vol. 1, 3. | Once again, it should be noted that the Committee was established to investigate, among other things, possible violations of the law. |
| This was not specified by the authorizing resolution. | This was not specified by the authorizing resolution. The Committee adopted a rule that witnesses and their attorneys could not examine other wit- | |

484

| Agency | Scope of agency's investigative authority | Extent of agency's subpoena power in investigative proceedings |
|---|---|---|
| Senate Committee to Investigate Lobbying (1935–1936)— Con. | or any other matter or proposal affecting legislation." S. Res. 165, 74th Cong., 1st Sess., 79 Cong. Rec. 11003. | correspondence, books, papers, and documents . . . as it . . . [deemed] advisable." S. Res. 165, 74th Cong., 1st Sess., 79 Cong. Rec. 11003. |

[1] This Appendix describes the Rules of Procedure governing the authorized investigative proceedings of a representative group of administrative agencies, executive departments, presidential commissions, and congressional committees. The Appendix does not purport to be a complete enumeration of the hundreds of agencies which have conducted investigations during the course of this country's history. Rather, it is designed to demonstrate that the procedures adopted by the Civil Rights Commission are similar to those which have traditionally been used by investigating agencies in both the executive and legislative branches of our Government.

[2] We have found many other administrative agencies and presidential commissions empowered to conduct investigations and to subpoena witnesses. Those agencies are not listed in the body of this Appendix because we were unable to find an adequate description of the rules of procedure governing their investigative proceedings. However, it is significant that the statutes creating these agencies made no reference to apprisal or cross-examination in investigative proceedings. Among the agencies in this category are: (1) Bureau of Corporations in the Department of Commerce and Labor, 32 Stat. 827; (2) Commission on Industrial Relations, 37 Stat. 415; (3) the Railroad Labor Board, 41 Stat. 469; (4) the United States Coal Commission, 42 Stat. 1023; (5) the Investigation Commission established by the Railroad Retirement Act of 1935, 49 Stat. 972; (6) National Bituminous Coal Commission, 49 Stat. 992; (7) Wage and Hour Division of the Department of Labor, 52 Stat. 1061; (8) Board of Investigation to Investigate Various Modes of Transportation, 54 Stat. 952; (9) Commission on Organization of the Executive Branch of the Government, 67 Stat. 143; (10) Commission on Intergovernmental Relations, 67 Stat. 145.

[3] If the relevant statute makes no reference to notice, this fact will be mentioned. The negative inference which may be drawn from the absence of any statutory requirement that notice be given is supported by the fact that, in a few instances, Congress has made specific provision for the giving of notice in investigative proceedings. See, e.g., the statutes cited on p. 473, supra, requiring the United States Tariff Commission to give reasonable notice of any investigative hearing.

[4] If the relevant statute makes no reference to cross-examination, that fact will be mentioned because of the inference which may be drawn therefrom that Congress did not intend persons appearing at investigative hearings to cross-examine other witnesses. This inference

| The type of notice required to be given in investigative proceedings [3] | The right, if any, of persons affected by an investigation to cross-examine others testifying at investigative proceedings [4] | Miscellaneous comments |
|---|---|---|
| | nesses; however, they could submit written questions, which the Committee would consider propounding to other witnesses. Hearings before Special Senate Committee to Investigate Lobbying Activities, 74th Cong., 2d Sess. 1469. | |

is strengthened by the fact that in a relatively few instances Congress has, for one reason or another, required that persons being investigated by a commission or agency be given the right to cross-examine other witnesses. See, *e.g.*, 49 Stat. 1381, which authorized the Secretary of Commerce to appoint special boards to investigate the causes of marine casualties.

[5] The Office of Price Stabilization is now defunct, having been terminated by Exec. Order No. 10434, 18 Fed. Reg. 809.

[6] The Office of Price Administration is now defunct, its functions having been transferred to the Office of Temporary Controls by Exec. Order No. 9809, 11 Fed. Reg. 14281, which in turn was terminated by Exec. Order No. 9841, 12 Fed. Reg. 2645.

[7] In addition to the investigating committees listed in the body of the Appendix, we think mention should also be made of the contemporary standing committees of Congress. Most of these committees have rules very similar to those adopted by the Civil Rights Commission. The Rules of Procedure of the Subcommittee on Privileges and Elections of the Senate Committee on Rules and Administration are typical. Rule 17 of the Rules reads as follows:

"There shall be no direct or cross examination by counsel appearing for a witness. However, the counsel may submit in writing any question or questions he wishes propounded to his client or to any other witness. With the consent of the majority of the Members of the Subcommittee present and voting, such question or questions shall be put to the witness by the Chairman, by a Member of the Subcommittee or by the Counsel of the Subcommittee either in the original form or in modified language. The decision of the Subcommittee as to the admissibility of questions submitted by counsel for a witness, as well as to their form, shall be final."

See also S. Rep. No. 2, 84th Cong., 1st Sess. 20; Hearings before the Subcommittee on Rules of the Senate Committee on Rules and Administration, on S. Res. 65, 146, 223, 249, 253, 256, S. Con. Res. 11, and 86, 83d Cong., 2d Sess., Part 3, 141–142, 344, 345, 374; Rules of Procedure of the Select Committee on Improper Activities in the Labor or Management Field, Rules 10 and 11. Reference has been made in the text, *supra*, pp. 436–439, to the House "fair play" rules, which govern the hearings of most House Committees, and which make no provision for cross-examination.

MR. JUSTICE FRANKFURTER, concurring in the result.

The United States Commission on Civil Rights, in exercising powers granted to it by the Civil Rights Act of 1957 (71 Stat. 635, 42 U. S. C. § 1975c), scheduled a hearing to be held by it in Shreveport, Louisiana, on July 13, 1959. By these two actions judgments were sought to declare the proposed hearing illegal and to restrain the members of the Commission from holding it.

The rules of procedure formulated by the Commission amply rest on leave of Congress. I need add nothing on this phase of the case to the Court's opinion. While it is a most salutary doctrine of constitutional adjudication to give a statute even a strained construction to avoid facing a serious doubt of constitutionality, "avoidance of a difficulty will not be pressed to the point of disingenuous evasion. Here the intention of the Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power. The problem must be faced and answered." *Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379. I have no such misgivings in the situation before us. I also agree with the Court's conclusion in rejecting the constitutional claims of the plaintiffs. In view, however, of divergencies between the Court's analysis and mine of the specific issues before us, including the authoritative relevance of *In re Groban,* 352 U. S. 330, and *Anonymous No. 6* v. *Baker,* 360 U. S. 287, I state my reasons for agreement.

To conduct the Shreveport hearing on the basis of sworn allegations of wrongdoing by the plaintiffs, without submitting to them these allegations and disclosing the identities of the affiants, would, it is claimed, violate the Constitution. The issue thus raised turns exclusively on the application of the Due Process Clause of the Fifth Amendment. The Commission's hearings are not proceedings requiring a person to answer for an "infamous crime," which must be based on an indictment of a grand

jury (Amendment V), nor are they "criminal prosecutions" giving an accused the rights defined by Amendment VI. Since due process is the constitutional axis on which decision must turn, our concern is not with absolutes, either of governmental power or of safeguards protecting individuals. Inquiry must be directed to the validity of the adjustment between these clashing interests—that of Government and of the individual, respectively—in the procedural scheme devised by the Congress and the Commission. Whether the scheme satisfies those strivings for justice which due process guarantees, must be judged in the light of reason drawn from the considerations of fairness that reflect our traditions of legal and political thought, duly related to the public interest Congress sought to meet by this legislation as against the hazards or hardship to the individual that the Commission procedure would entail.

Barring rare lapses, this Court has not unduly confined those who have the responsibility of governing within a doctrinaire conception of "due process." The Court has been mindful of the manifold variety and perplexity of the tasks which the Constitution has vested in the legislative and executive branches of the Government by recognizing that what is unfair in one situation may be fair in another. Compare, for instance, *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, with *Ng Fung Ho* v. *White*, 259 U. S. 276, and see *Communications Comm'n* v. *WJR*, 337 U. S. 265, 275. Whether the procedure now questioned offends "the rudiments of fair play," *Chicago, M. & St. P. R. Co.* v. *Polt*, 232 U. S. 165, 168, is not to be tested by loose generalities or sentiments abstractly appealing. The precise nature of the interest alleged to be adversely affected or of the freedom of action claimed to be curtailed, the manner in which this is to be done and the reasons for doing it, the balance of individual hurt and the justifying public good—these and such like are the

considerations, avowed or implicit, that determine the judicial judgment when appeal is made to "due process."

The proposed Shreveport hearing creates risks of harm to the plaintiffs. It is likewise true that, were the plaintiffs afforded the procedural rights they seek, they would have a greater opportunity to reduce these risks than will be theirs under the questioned rules of the Commission. Some charges touching the plaintiffs might be withdrawn or modified, if those making them knew that their identities and the content of their charges were to be revealed. By the safeguards they seek the plaintiffs might use the hearing as a forum for subjecting the charges against them to a scrutiny that might disprove them or, at least, establish that they are not incompatible with innocent conduct.

Were the Commission exercising an accusatory function, were its duty to find that named individuals were responsible for wrongful deprivation of voting rights and to advertise such finding or to serve as part of the process of criminal prosecution, the rigorous protections relevant to criminal prosecutions might well be the controlling starting point for assessing the protection which the Commission's procedure provides. The objectives of the Commission on Civil Rights, the purpose of its creation, and its true functioning are quite otherwise. It is not charged with official judgment on individuals nor are its inquiries so directed. The purpose of its investigations is to develop facts upon which legislation may be based. As such, its investigations are directed to those concerns that are the normal impulse to legislation and the basis for it. To impose upon the Commission's investigations the safeguards appropriate to inquiries into individual blameworthiness would be to divert and frustrate its purpose. Its investigation would be turned into a forum for the litigation of individual culpability—matters which are not within the keeping

of the Commission, with which it is not effectively equipped to deal, and which would deflect it from the purpose for which it was within its limited life established.

We would be shutting our eyes to actualities to be unmindful of the fact that it would dissuade sources of vitally relevant information from making that information known to the Commission, if the Commission were required to reveal its sources and subject them to cross-examination. This would not be a valid consideration for secrecy were the Commission charged with passing official incriminatory or even defamatory judgment on individuals. Since the Commission is merely an investigatorial arm of Congress, the narrow risk of unintended harm to the individual is outweighed by the legislative justification for permitting the Commission to be the critic and protector of the information given it. It would be wrong not to assume that the Commission will responsibly scrutinize the reliability of sworn allegations that are to serve as the basis for further investigation and that it will be rigorously vigilant to protect the fair name of those brought into question.

In appraising the constitutionally permissive investigative procedure claimed to subject individuals to incrimination or defamation without adequate opportunity for defense, a relevant distinction is between those proceedings which are preliminaries to official judgments on individuals and those, like the investigation of this Commission, charged with responsibility to gather information as a solid foundation for legislative action. Judgments by the Commission condemning or stigmatizing individuals are not called for. When official pronouncements on individuals purport to rest on evidence and investigation, it is right to demand that those so accused be given a full opportunity for their defense in such investigation, excepting, of course, grand jury investigations. The functions of that institution and its constitutional prerog-

atives are rooted in long centuries of Anglo-American history. On the other hand, to require the introduction of adversary contests relevant to determination of individual guilt into what is in effect a legislative investigation is bound to thwart it by turning it into a serious digression from its purpose.

The cases in which this Court has recently considered claims to procedural rights in investigative inquiries alleged to deal unfairly with the reputation of individuals or to incriminate them, have made clear that the fairness of their procedures is to be judged in light of the purpose of the inquiry, and, more particularly, whether its essential objective is official judgment on individuals under scrutiny. Such a case was *Greene* v. *McElroy,* 360 U. S. 474. There the inquiry was for the purpose of determining whether the security clearance of a particular person was to be revoked. A denial of clearance would shut him off from the opportunity of access to a wide field of employment. The Court concluded that serious constitutional questions were raised by denial of the rights to confront accusatory witnesses and to have access to unfavorable reports on the basis of which the very livelihood of an individual would be gravely jeopardized. Again, *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, presented a contrasting situation to the one before us. The Government there sought through the Attorney General to designate organizations as "Communist," thus furnishing grounds on which to discharge their members from government employment. No notice was given of the charges against the organizations nor were they given an opportunity to establish the innocence of their aims and acts. It was well within the realities to say of what was under scrutiny in *Joint Anti-Fascist Refugee Committee* v. *McGrath* that "It would be blindness . . . not to recognize that in the conditions of our time such designation drastically restricts

the organizations, if it does not proscribe them." 341 U. S., at 161 (concurring opinion). And the procedure which was found constitutionally wanting in that case could be fairly characterized as action "to maim or decapitate, on the mere say-so of the Attorney General, an organization to all outward-seeming engaged in lawful objectives . . . ." *Ibid.* Nothing like such characterization can remotely be made regarding the procedure for the proposed inquiry of the Commission on Civil Rights.

Contrariwise, decisions arising under the Due Process Clause of the Fourteenth Amendment strongly support the constitutionality of what is here challenged, where the purposes were as here truly investigatorial. Thus, *In re Groban,* 352 U. S. 330, sustained inquiry by the Ohio State Fire Marshal into the causes of a fire while excluding counsel of subpoenaed witnesses on whose premises the fire occurred. The Court so held even though the Fire Marshal had authority, after questioning a witness, to arrest him if he believed there was sufficient evidence to charge him with arson. The guiding consideration was that, although suspects might be discovered, the essential purpose of the Fire Marshal's inquiry was not to adjudicate individual responsibility for the fire but to pursue a legislative policy of fire prevention through the discovery of the origins of fires. This decision was applied in *Anonymous No. 6* v. *Baker,* 360 U. S. 287, which concerned "a state judicial Inquiry into alleged improper practices at the local bar" (at p. 288). Rejecting the claim based on the consideration that the inquiry might serve as a groundwork for the prosecution of witnesses called before it, the Court applied *Groban* because the inquiry was a general one and appellants were before it not as potential accused but "solely as witnesses." The proposed investigation of the Commission on Civil Rights is much less likely to result in prosecution of witnesses before it than were the investigations in *Groban* and

*Baker.* Just as surely, there is not present in the cases now before us a drastic official judgment, as in *Greene* and *Joint Anti-Fascist Refugee Committee,* where the Court deemed it necessary to insure that full opportunity for defense be accorded to individuals who were the specific, adverse targets of the secret process.

Moreover, the limited, investigatorial scope of the challenged hearing is carefully hedged in with protections for the plaintiffs. They will have the right to be accompanied by counsel. The rules insure that they will be made aware of the subject of the hearings. They will have the right to appeal to the Commission's power to subpoena additional witnesses. The rules significantly direct the Commission to abstain from public exposure by taking in executive session any evidence or testimony tending "to defame, degrade, or incriminate any person." A person so affected is given the right to read such evidence and to reply to it. These detailed provisions are obviously designed as safeguards against injury to persons who appear in public hearings before the Commission. The provision for screening defamatory and incriminatory testimony in order to keep it from the public may well be contrasted with the procedure in the *Joint Anti-Fascist* case, where the very purpose of the inquiry was to make an official judgment that certain organizations were "Communist." Such condemnation of an organization would of course taint its members. The rules of the Commission manifest a sense of its responsibility in carrying out the limited investigatorial task confided to it. It is not a constitutional requirement that the Commission be argumentatively turned into a forum for trial of the truth of particular allegations of denial of voting rights in order thereby to invalidate its functioning. Such an inadmissible transformation of the Commission's function is in essence what is involved in the claims of the plaintiffs. Congress has entrusted the Commission with a very dif-

ferent role—that of investigating and appraising general conditions and reporting them to Congress so as to inform the legislative judgment. Resort to a legislative commission as a vehicle for proposing well-founded legislation and recommending its passage to Congress has ample precedent.

Finally it should be noted that arguments directed either at the assumed novelty of employing the Commission in the area of legislative interest which led Congress to its establishment, or at the fact that the source of the Commission's procedures were those long used by Committees of Congress, are not particularly relevant. History may satisfy constitutionality, but constitutionality need not produce the title deeds of history. Mere age may establish due process, but due process does not preclude new ends of government or new means for achieving them. Since the Commission has, within its legislative framework, provided procedural safeguards appropriate to its proper function, claims of unfairness offending due process fall. The proposed Shreveport hearing fully comports with the Constitution and the law. Accordingly I join the judgment of the Court in reversing the District Court.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK joins, concurring.

In joining the Court's opinion, as I do, I desire to add that in my view the principles established by *In re Groban*, 352 U. S. 330, and *Anonymous* v. *Baker*, 360 U. S. 287, are dispositive of the issues herein in the Commission's favor.

MR JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

With great deference to my Brethren I dissent from a reversal of these judgments.

The cause which the majority opinion serves is, on the surface, one which a person dedicated to constitutional

494

principles could not question. At the bottom of this controversy is the right to vote protected by the Fifteenth Amendment. That Amendment withholds power from either the States or the United States to deny or abridge the right to vote "on account of race, color, or previous condition of servitude." This right stands beyond the reach of government. Only voting qualifications that conform to the standards proscribed by the Fifteenth Amendment may be prescribed. See *Lassiter* v. *Northampton Election Board,* 360 U. S. 45. As stated in *Terry* v. *Adams,* 345 U. S. 461, 468, "The Amendment, the congressional enactment and the cases make explicit the rule against racial discrimination in the conduct of elections." By democratic values this right is fundamental, for the very existence of government dedicated to the concept "of the people, by the people, for the people," to use Lincoln's words, depends on the franchise.

Yet important as these civil rights are, it will not do to sacrifice other civil rights in order to protect them. We live and work under a Constitution. The temptation of many men of goodwill is to cut corners, take short cuts, and reach the desired end regardless of the means. Worthy as I think the ends are which the Civil Rights Commission advances in these cases, I think the particular means used are unconstitutional.

The Commission, created by Congress, is a part of "the executive branch" of the Government, 71 Stat. 634, 42 U. S. C. § 1975 (a), whose members are appointed by the President and confirmed by the Senate. § 1975 (a). It is given broad powers of investigation with the view of making a report with "findings and recommendations" to the Congress. § 1975c. It is empowered, among other things, to

"investigate allegations in writing under oath or affirmation that certain citizens of the United States

are being deprived of their right to vote and have that vote counted by reason of their color, race, religion, or national origin; which writing, under oath or affirmation, shall set forth the facts upon which such belief or beliefs· are based." § 1975c (a)(1).

Complaints have been filed with the Commission charging respondents, who are registrars of voters in Louisiana, with depriving persons of their voting rights by reason of their color. If these charges are true and if the registrars acted willfully (see *Screws* v. *United States,* 325 U. S. 91), the registrars are criminally responsible under a federal statute which subjects to fine and imprisonment [1] anyone who willfully deprives a citizen of any right under the Constitution "by reason of his color, or race." [2] 18 U. S. C. § 242.

The investigation and hearing by the Commission are therefore necessarily aimed at determining if this criminal law has been violated. The serious and incriminating nature of the charge and the disclosure of facts concerning it are recognized by the Congress, for the Act requires certain protective procedures to be adopted where defamatory, degrading, or incriminating evidence may be adduced.

> "If the Commission determines that evidence or testimony at any hearing may tend to defame, degrade, or incriminate any person, it shall (1) receive such evidence or testimony in executive session; (2) afford

---

[1] Civil suits for damages are also authorized. See 42 U. S. C. § 1983; *Lane* v. *Wilson,* 307 U. S. 268.

[2] The section reads in relevant part as follows:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . by reason of his color, or race . . . shall be fined not more than $1,000 or imprisoned not more than one year, or both."

such person an opportunity voluntarily to appear as a witness; and (3) receive and dispose of requests from such person to subpena additional witnesses." 42 U. S. C. § 1975a (e).

Yet these safeguards, given as a matter of grace, do not in my judgment dispose of the constitutional difficulty. First, it is the Commission's judgment, not the suspect's, that determines whether the hearing shall be secret or public. Thus this procedure has one of the evils protested against in *In re Groban*, 352 U. S. 330, 337, 348–353 (dissenting opinion). The secrecy of the inquisition only underlines its inherent vices: "Secret inquisitions are dangerous things justly feared by free men everywhere. They are the breeding place for arbitrary misuse of official power. They are often the beginning of tyranny as well as indispensable instruments for its survival. Modern as well as ancient history bears witness that both innocent and guilty have been seized by officers of the state and whisked away for secret interrogation or worse until the groundwork has been securely laid for their inevitable conviction." *Id.*, at 352–353. As said in dissent in *Anonymous* v. *Baker*, 360 U. S. 287, 299, "secretly compelled testimony does not lose its highly dangerous potentialities merely because" it is taken in preliminary proceedings. Second, the procedure seems to me patently unconstitutional whether the hearing is public or secret. Under the Commission's rules the accused is deprived of the right to notice of the charges against him and the opportunity of cross-examination. This statutory provision, fashioned to protect witnesses as such rather than a prospective defendant, permits the Commission to exclude the accused entirely from the hearing and deny him the opportunity even to observe the testimony of his accusers. And even if the Commission were inclined in a particular case to protect the accused from the opprobrium likely to flow from the testimony of

individual witnesses against him by holding secret sessions, this would be little comfort after the Commission's findings, based on such untested evidence, were publicized across the Nation.

I assume that no court would be justified in enjoining a Congressional Committee composed of Senators or Congressmen that engaged in this kind of conduct. This is not that kind of a committee. Moreover, even if it were and if private rights were infringed by reason of the Committee's violations of the Constitution, there are circumstances when redress can be had in the courts. *Kilbourn* v. *Thompson,* 103 U. S. 168. Cf. *Greenfield* v. *Russel,* 292 Ill. 392, 127 N. E. 102; *Opinion of the Justices,* 96 N. H. 530, 73 A. 2d 433. The judiciary also becomes implicated when the Congress asks the courts to back up what its Committees have done; or when a victim of an investigation asks relief from punishment imposed on him. Then the procedural safeguards of the Bill of Rights come into full play. See *Watkins* v. *United States,* 354 U. S. 178.

The Civil Rights Commission, however, is not a Congressional Committee of Senators or Congressmen; nor is it an arm of Congress. It is an arm of the Executive. There is, in my view, only one way the Chief Executive may move against a person accused of a crime and deny him the right of confrontation and cross-examination and that is by the grand jury.

The grand jury is the accusatory body in federal law as provided by the Fifth Amendment. The essence of the institution of the grand jury was stated by 1 Stephen, History of Criminal Law of England, 252: "The body of the country are the accusers." Thomas Erskine stated the matter accurately and eloquently in *Jones* v. *Shipley,* 21 How. St. Tr. 847, 977.

"[I]t is unnecessary to remind your lordships, that, in a civil case, the party who conceives himself

aggrieved, states his complaint to the court,—avails himself at his own pleasure of its process,—compels an answer from the defendant by its authority,—or taking the charge *pro confesso* against him on his default, is entitled to final judgment and execution for his debt, without any interposition of a jury. But in criminal cases it is otherwise; the court has no cognizance of them, without leave from the people forming a grand inquest. If a man were to commit a capital offence in the face of all the judges of England, their united authority could not put him upon his trial:—they could file no complaint against him, even upon the records of the supreme criminal court, but could only commit him for safe custody, which is equally competent to every common justice of the peace:—the grand jury alone could arraign him, and in their discretion might likewise finally discharge him, by throwing out the bill, with the names of all your lordships as witnesses on the back of it. If it shall be said, that this exclusive power of the grand jury does not extend to lesser misdemeanors, which may be prosecuted by information; I answer, that for that very reason it becomes doubly necessary to preserve the power of the other jury which is left."

This idea, though uttered in 1783, is modern and relevant here. The grand jury brings suspects before neighbors, not strangers. Just recently in *Stirone* v. *United States*, 361 U. S. 212, 218, we said, "The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."

This Commission has no such guarantee of fairness. Its members are not drawn from the neighborhood. The

members cannot be as independent as grand juries because they meet not for one occasion only; they do a continuing job for the executive and, if history is a guide, tend to acquire a vested interest in that role.

The grand jury, adopted as a safeguard against "hasty, malicious, and oppressive" action by the Federal Government, *Ex parte Bain,* 121 U. S. 1, 12, stands as an important safeguard to the citizen against open and public accusations of crime. Today the grand jury may act on its own volition, though originally specific charges by private prosecutors were the basis of its action. *Hale* v. *Henkel,* 201 U. S. 43, 59–60. It has broad investigational powers to look into what may be offensive against federal criminal law. *United States* v. *Johnson,* 319 U. S. 503, 510. An indictment returned by a grand jury may not be challenged because it rests wholly on hearsay. *Costello* v. *United States,* 350 U. S. 359, 361–362. An accused is not entitled to a hearing before a grand jury, nor to present evidence, nor to be represented by counsel; and a grand jury may act secretly—a procedure normally abhorrent to due process. In this country as in England of old, the grand jury is convened as a body of laymen, free from technical rules, acting in secret, pledged to indict no one because of prejudice and to free no one because of special favor. *Costello* v. *United States, supra,* at 362.

Grand juries have their defects. They do not always return a true bill, for while the prejudices of the community may radiate through them, they also have the saving quality of being familiar with the people involved. They are the only accusatory body in the Federal Government that is recognized by the Constitution. I would allow no other engine of government, either executive or legislative, to take their place—at least when the right of confrontation and cross-examination are denied the accused as is done in these cases.

The might and power of the Federal Government have no equal. When its guns are leveled at a citizen on charges that he committed a federal crime, it is for me no answer to say that the only purpose is to report his activities to the President and Congress, not to turn him over to the District Attorney for prosecution. Our Constitution was drawn on the theory that there are certain things government may not do to the citizen and that there are other things that may be done only in a specific manner. The relationship of the Federal Government to a man charged with crime is carefully defined. Its power may be marshalled against him, but only in a defined way. When we allow this substitute method, we make an innovation that does not comport with that due process which the Fifth Amendment requires of the Federal Government. When the Federal Government prepares to inquire into charges that a person has violated federal law, the Fifth Amendment tells us how it can proceed.

The Civil Rights Commission, it is true, returns no indictment. Yet in a real sense the hearings on charges that a registrar has committed a federal offense are a trial. Moreover, these hearings before the Commission may be televised or broadcast on the radio.[3] In our day we have seen Congressional Committees probing into alleged criminal conduct of witnesses appearing on the television screen. This is in reality a trial in which the

---

[3] The Rules of the Commission by Subdivision (k) provide:

"Subject to the physical limitations of the hearing room and consideration of the physical comfort of Commission members, staff, and witnesses, equal and reasonable access for coverage of the hearings shall be provided to the various means of communications, including newspapers, magazines, radio, news reels, and television. However, no witness shall be televised, filmed or photographed during the hearings if he objects on the ground of distraction, harassment, or physical handicap."

whole Nation sits as a jury. Their verdict does not send men to prison. But it often condemns men or produces evidence to convict and even saturates the Nation with prejudice against an accused so that a fair trial may be impossible. As stated in 37 A. B. A. J. 392 (1951), "If several million television viewers see and hear a politician, a businessman or a movie actor subjected to searching interrogation, without ever having an opportunity to cross-examine his accusers or offer evidence in his own support, that man will stand convicted, or at least seriously compromised, in the public mind, whatever the later formal findings may be." The use of this procedure puts in jeopardy our traditional concept of the way men should be tried and replaces it with "a new concept of guilt based on inquisitorial devices." Note, 26 Temp. L. Q. 70, 73.

Yet whether the hearing is televised or not it will have all the evils of a legislative trial. "The legislative trial," wrote Alan Barth in Government by Investigation (1955) p. 81, "is a device for condemning men without the formalities of due process." And he went on to say:

> "The legislative trial serves three distinct though related purposes: (1) it can be used to punish conduct which is not criminal; (2) it can be used to punish supposedly criminal conduct in the absence of evidence requisite to conviction in a court of law; and (3) it can be used to drive or trap persons suspected of 'disloyalty' into committing some collateral crime such as perjury or contempt of Congress, which can then be subjected to punishment through a judicial proceeding. 'It is hard to get them for their criminal activities in connection with espionage, but a way has been found,' Senator McCarthy once remarked. 'We are getting them for perjury and putting some of the worst of them away. For that

reason I hope every witness who comes here is put under oath and his testimony is gone over with a fine-tooth comb, and if we cannot convict some of them for their disloyal activities, perhaps we can convict some of them for perjury.' That they may have been guilty of no violation of law in the first place seems of no concern to the Senator." *Id.*, at 83. And see Telford Taylor, Grand Inquest (1955).

Barth wrote of hearings in the so-called loyalty cases. But the reasons apply to any hearing where a person's job or liberty or reputation is at stake. Barth wrote of hearings held by Congressional Committees. Yet the evil is compounded where the "legislative trial" has become a "Commission trial." And while I assume that a court would not enjoin the typical Congressional Committee, it is duty bound to keep commissions within limits, when its jurisdiction is properly invoked.

The right to know the claims asserted against one and to contest them—to be heard—to conduct a cross-examination—these are all implicit in our concept of "a full and fair hearing" before any administrative agency, as the Court in *Morgan* v. *United States*, 304 U. S. 1, 18, emphasized. We spoke there in the context of civil litigation where property was at stake. Here the need for all the protective devices of a fair hearing is greater. For one's job and perhaps his liberty are hinged on these hearings.

We spoke in the tradition of the *Morgan* case only recently in *Greene* v. *McElroy*, 360 U. S. 474, 496–497.

"Certain principles have remained relatively immutable in our jurisprudence. *One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so*

*that he has an opportunity to show that it is untrue.*
While this is important in the case of documentary
evidence, it is even more important where the evi-
dence consists of the testimony of individuals whose
memory might be faulty or who, in fact, might be
perjurers or persons motivated by malice, vindictive-
ness, intolerance, prejudice, or jealousy. We have
formalized these protections in the requirements of
confrontation and cross-examination. They have
ancient roots. They find expression in the Sixth
Amendment which provides that in all criminal cases
the accused shall enjoy the right 'to be confronted
with the witnesses against him.' This Court has
been zealous to protect these rights from erosion. It
has spoken out not only in criminal cases, . . . but
also in all types of cases where administrative and
regulatory actions were under scrutiny." (Italics
added.)

We spoke there in a context where men were being
deprived of their jobs as a result of investigations into
their loyalty. Certainly no less is required if hearings
are to be held on charges that a person has violated a
federal law.

Respondents ask no more than the right to know the
charges, to be confronted with the accuser, and to cross-
examine him. Absent these rights, they ask for an
injunction. In the *Greene* case we said these rights were
available "where governmental action seriously injures an
individual." 360 U. S., at 496. Injury is plain and
obvious here—injury of a nature far more serious than
merely losing one's job, as was the situation in the *Greene*
case. If the hearings are to be without the safeguards
which due process requires of all trials—civil and crim-
inal—there is only one way I know by which the Federal
Government may proceed and that is by grand jury. If
these trials before the Commission are to be held on

504

charges that these respondents are criminals, the least we can do is to allow them to know what they are being tried for, and to confront their accusers and to cross-examine them.[4] This protection would be extended to them in any preliminary hearing, even in one before a United States Commissioner.[5] Confrontation and cross-examination are so basic to our concept of due process (*Peters* v. *Hobby,* 349 U. S. 331, 351–352 (concurring opinion)) that no proceeding by an administrative agency is a fair one that denies these rights.

References are made to federal statutes governing numerous administrative agencies such as the Federal Trade Commission and the Securities and Exchange Commission; and the inference is that what is done in this case can be done there. This comes as a surprise to one who for some years was engaged in those administrative investigations. No effort was ever made, so far as I am aware, to compel a person, charged with violating a federal law, to run the gantlet of a hearing over his objection.

[4] Cf. Frankfurter, Hands Off the Investigations, New Republic, May 21, 1924, p. 329, at 331: "It must be remembered that our rules of evidence are but tools for ascertaining the truth, and that these tools vary with the nature of the issues and the nature of the tribunal seeking facts. Specifically, the system of rules of evidence used in trials before juries 'are mainly aimed at guarding the jury from the over-weening effect of certain kinds of evidence.' That system, as pointed out by Wigmore, 'is not applicable by historical precedent, or by sound practical policy' to 'inquiries of fact determinable by administrative tribunals.' Still less is it applicable to inquiries by congressional committees. Of course the essential decencies must be observed, namely opportunity for cross-examination must be afforded to those who are investigated or to those representing issues under investigation."

[5] Rule 5 (b), Rules of Criminal Procedure, provides that the defendant shall be informed of the complaint against him and of his right to retain counsel. Rule 5 (c) expressly states, "The defendant may cross-examine witnesses against him and may introduce evidence in his own behalf."

No objection based either on the ground now advanced nor on the Fifth Amendment was, so far as I know, ever overruled. Investigations were made; and they were searching. Such evidence of law violations as was obtained was turned over to the Department of Justice. But never before, I believe, has a federal executive agency attempted, over the objections of an accused, to force him through a hearing to determine whether he has violated a federal law. If it did, the action was lawless and courts should have granted relief.

What we do today is to allow under the head of due process a fragmentation of proceedings against accused people that seems to me to be foreign to our system. No indictment is returned, no commitment to jail is made, no formal criminal charges are made. Hence the procedure is condoned as violating no constitutional guarantee. Yet what is done is another short cut used more and more these days to "try" men in ways not envisaged by the Constitution. The result is as damaging as summoning before committees men who it is known will invoke the Fifth Amendment and pillorying them for asserting their constitutional rights. This case—like the others—is a device to expose people as suspects or criminals. The concept of due process which permits the invention and use of prosecutorial devices not included in the Constitution makes due process reflect the subjective or even whimsical notions of a majority of this Court as from time to time constituted. Due process under the prevailing doctrine is what the judges say it is; and it differs from judge to judge, from court to court. This notion of due process makes it a tool of the activists who respond to their own visceral reactions in deciding what is fair, decent, or reasonable. This elastic concept of due process is described in the concurring opinion as follows:

> "Whether the scheme satisfies those strivings for justice which due process guarantees, must be judged in

the light of reason drawn from the considerations of fairness that reflect our traditions of legal and political thought, duly related to the public interest Congress sought to meet by this legislation as against the hazards or hardship to the individual that the Commission procedure would entail."

When we turn to the cases, personal preference, not reason, seems, however, to be controlling.

Illustrative are the First Amendment protection given to the activities of a classroom teacher by the Due Process Clause of the Fourteenth Amendment in *Sweezy* v. *New Hampshire,* 354 U. S. 234, 255, 261–263 (concurring opinion), but denied to the leader of an organization holding discussion groups at a summer camp in *Uphaus* v. *Wyman,* 360 U. S. 72; the decisions that due process was violated by the use of evidence obtained by the forceful use of a stomach pump in *Rochin* v. *California,* 342 U. S. 165, but not when evidence was used which was obtained by taking the blood of an unconscious prisoner. *Breithaupt* v. *Abram,* 352 U. S. 432.

It is said in defense of this chameleon-like due process that it is not "an exercise of whim or will," that it is "founded on something much deeper and more justifiable than personal preference. As far as it lies within human limitations, it must be an impersonal judgment. It must rest on fundamental presuppositions rooted in history to which widespread acceptance may fairly be attributed." *Sweezy* v. *New Hampshire, supra,* at 267 (concurring opinion). Yet one who tries to rationalize the cases on cold logic or reason fails. The answer turns on the personal predilections of the judge; and the louder the denial the more evident it is that emotion rather than reason dictates the answer. This is a serious price to pay for adopting a free-wheeling concept of due process, rather than confining it to the procedures and devices enu-

merated in the Constitution itself. As said in *Adamson v. California*, 332 U. S. 46, 68, 89 (dissenting opinion):

"In my judgment the people of no nation can lose their liberty so long as a Bill of Rights like ours survives and its basic purposes are conscientiously interpreted, enforced and respected so as to afford continuous protection against old, as well as new, devices and practices which might thwart those purposes. I fear to see the consequences of the Court's practice of substituting its own concepts of decency and fundamental justice for the language of the Bill of Rights as its point of departure in interpreting and enforcing that Bill of Rights."

That was written concerning the meaning of the Due Process Clause of the Fourteenth Amendment. But it has equal vitality when applied to the Due Process Clause of the Fifth Amendment with which we are now concerned.

I think due process is described in the Constitution and limited and circumscribed by it. The Constitution is explicit as respects the permissible accusatory process that the Executive can employ against the citizen. Men of goodwill, not evil ones only, invent, under feelings of urgency, new and different procedures that have an awful effect on the citizen. The new accusatory procedure survives if a transient majority of the Court are persuaded that the device is fair or decent. My view of the Constitution confines judges—as well as the lawmakers and the Executive—to the procedures expressed in the Constitution. We look to the Constitution—not to the personal predilections of the judges—to see what is permissible. Since summoning an accused by the Government to explain or justify his conduct, that is charged as a crime, may be done only in one way, I would require a constitutional amendment before it can be done in a different way.

The alternate path which we take today leads to trial of separate essential parts of criminal prosecutions by commissions, by executive agencies, by legislative committees. Farming out pieces of trials to investigative agencies is fragmentizing the kind of trial the Constitution authorizes. It prejudices the ultimate trial itself; and it puts in the hands of officials the awesome power which the Framers entrusted only to judges, grand jurors and petit jurors drawn from the community where the accused lives. It leads to government by inquisition.

The Civil Rights Commission can hold all the hearings it desires; it can adduce testimony from as many people as it likes; it can search the records and archives for such information it needs to make an informed report to Congress. See *United States* v. *Morton Salt Co.,* 338 U. S. 632; *Oklahoma Press Pub. Co.* v. *Walling,* 327 U. S. 186. But when it summons a person, accused under affidavit of having violated the federal election law, to see if the charge is true, it acts in lieu either of a grand jury or of a committing magistrate. The sifting of criminal charges against people is for the grand jury or for judges or magistrates and for them alone under our Constitution. In my view no other accusatory body can be used that withholds the rights of confrontation and cross-examination from those accused of federal crimes.

I would affirm these judgments.